Brian PAUL, Appellant

v.

The STATE of Texas, Appellee.

No. 12–10–00280–CR.

Court of Appeals of Texas,
Tyler.

July 31, 2012.

Discretionary Review Refused
Feb. 6, 2013.

Carlo D'Angelo, Brian Paul, for Appellant.

Brooke Taylor, Michael J. West, Brenham, for The State of Texas.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and HOYLE, J.

## OPINION

SAM GRIFFITH, Justice.

Brian Paul appeals his conviction for aggravated robbery, for which he was sentenced to imprisonment for fifty years. Appellant raises six issues on appeal. We affirm.

## BACKGROUND

Appellant was one of four longtime friends from Fort Worth, Texas. The other three friends were Markquette Adedeji, Clint Johnson, and Marcus Walker. Each of the four moved to Tyler, Texas, to attend Texas College. Adedeji, Johnson, and Appellant lived together at the Varsity Place Apartments in Tyler with a fourth roommate, Ayodele Akinbote.[1] In March 2009, notice to vacate the premises by March 31 due to nonpayment of rent was sent to Appellant. Thereafter, Adedeji, Johnson, and Walker hatched a plan whereby they would rob the Dollar General store near Troup Highway in Tyler.

At approximately 8:20 p.m. on March 30, 2009, the Dollar General store near Troup Highway in Tyler was robbed. Surveillance video from the store shows four men with their identities hidden robbing store manager Camille Taylor and assistant manager Christina Irvin. Two of the men brandished handguns—a .45 caliber automatic pistol and an airsoft pistol—during the robbery. The four men escaped with approximately $1,800 to $2,000 along with Irvin's wallet.

On April 1, 2009, Tracy James was driving on Paluxy Drive in Tyler when she observed someone throw a wallet from the vehicle traveling in front of hers. James wrote down the license plate number of the vehicle, recovered the wallet, and contacted police. The wallet contained Irvin's social security card. The license plate number was determined to match a 1986 Chevrolet Caprice. On April 2, 2009, this same vehicle was stopped by police. The driver of the vehicle was identified as Adedeji.

Appellant was implicated as being the fourth perpetrator of this crime and was charged by indictment with aggravated robbery. Appellant pleaded "not guilty," and the matter proceeded to a jury trial. Ultimately, the jury found Appellant "guilty" as charged. The matter proceeded to a jury trial on punishment. At the conclusion of the punishment phase, the jury assessed Appellant's punishment at imprisonment for fifty years. The trial court sentenced Appellant accordingly, and this appeal followed.

## EVIDENTIARY SUFFICIENCY

In his first issue, Appellant argues that the evidence is insufficient to support the trial court's judgment. Specifically, Appellant contends that the evidence is insufficient to support his identity as one of the perpetrators of the aggravated robbery in question.

### Standard of Review

The *Jackson v. Virginia*[2] legal sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *See Brooks v. State*, 323 S.W.3d 893, 894 (Tex.Crim.App.2010). Under *Jackson*, legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction. *See Jackson*, 443 U.S. at 315–16, 99 S.Ct. at 2786–87; *see also Escobedo v. State*, 6 S.W.3d 1, 6 (Tex.App.-San Antonio 1999, pet. ref'd). The standard for reviewing a legal sufficiency challenge is whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 320, 99 S.Ct. at 2789; *see also Johnson v. State*, 871 S.W.2d 183, 186

---

1. Walker would stay at the apartment two to three times per week.

2. 443 U.S. 307, 315–16, 99 S.Ct. 2781, 2786–87, 61 L.Ed.2d 560 (1979).

(Tex.Crim.App.1993). The evidence is examined in the light most favorable to the verdict. *See Jackson,* 443 U.S. at 320, 99 S.Ct. at 2789; *Johnson,* 871 S.W.2d at 186. A successful legal sufficiency challenge will result in rendition of an acquittal by the reviewing court. *See Tibbs v. Florida,* 457 U.S. 31, 41–42, 102 S.Ct. 2211, 2217–18, 72 L.Ed.2d 652 (1982).

The sufficiency of the evidence is measured against the offense as defined by a hypothetically correct jury charge. *See Malik v. State,* 953 S.W.2d 234, 240 (Tex. Crim.App.1997). Such a charge would include one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant is tried." *Id.*

To support Appellant's conviction for aggravated robbery, the State was required to prove, among other things, Appellant's identity as the person who committed the crime. *See* Tex. Penal Code Ann. §§ 29.02(a), 29.03(a)(2) (West 2011). To meet its burden, the State offered accomplice testimony from Adedeji. As part of his first issue, Appellant argues that Adedeji's testimony is not sufficiently corroborated.

### Corroboration of Accomplice Testimony

 The Texas Legislature has determined that the factfinder should exercise caution when considering the testimony of an accomplice; "accomplices often have incentives to lie, such as to avoid punishment or shift blame to another person." *Smith v. State,* 332 S.W.3d 425, 439 (Tex.Crim. App.2011). Texas Code of Criminal Procedure, Article 38.14 states that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." Tex.Code Crim. Proc. Ann. art. 38.14 (West 2005). Therefore, under Article 38.14, a conviction cannot stand on an accomplice witness's testimony unless the testimony is corroborated by other, nonaccomplice evidence that tends to connect the accused to the offense. *Smith,* 332 S.W.3d at 439. In order to determine whether the accomplice witness testimony is corroborated, we must eliminate all accomplice evidence and determine whether the other inculpatory facts and circumstances in evidence would allow rational jurors to connect the appellant to the offense. *See Simmons v. State,* 282 S.W.3d 504, 508 (Tex.Crim.App.2009); *McDuff v. State,* 939 S.W.2d 607, 612 (Tex. Crim.App.1997). Evidence that the offense was committed is insufficient to corroborate an accomplice's testimony. *Smith,* 332 S.W.3d at 439. But the nonaccomplice evidence does not have to directly link the appellant to the crime, nor does it alone have to establish his guilt beyond a reasonable doubt; but rather, the nonaccomplice evidence merely has to tend to connect the appellant to the offense. *See McDuff,* 939 S.W.2d at 613. When there are two permissible views of the evidence, one tending to connect the defendant to the offense and the other not tending to connect the defendant to the offense, appellate courts should defer to that view of the evidence chosen by the factfinder. *See Simmons,* 282 S.W.3d at 508. An accomplice's testimony cannot be corroborated by prior statements made by the accomplice witness to a third person. *Smith,* 332 S.W.3d at 439.

### Accomplice Testimony of Markquette Adedeji

In the case at hand, Adedeji testified that he lived at the Varsity Place Apartments with Appellant, Johnson, and Akin-

bote and that Walker would occasionally stay there as well. Adedeji further testified that they discovered that they were going to be evicted. As a result, on March 30, 2009, he, Walker, and Johnson hatched a plan to commit a robbery and pay their rent with the proceeds. Adedeji stated that Appellant was not present when the robbery was planned, but that he, Walker, and Johnson picked Appellant up at Kay Francis's [3] apartment that evening on the way to the robbery. Adedeji testified that the four of them drove to a location near the Dollar General store on Troup Highway in Tyler, Texas. Adedeji further testified that they lay in wait until the two workers at the Dollar General store were leaving after the store was closed. At that point, according to Adedeji, the group accosted the two workers at gunpoint [4] and took them back inside the store. Adedeji stated that once they were inside, they demanded money and, ultimately, escaped with approximately $1,600 and one of the workers' purse. Adedeji further stated that, thereafter, the group drove back to the Varsity Place Apartments. Adedeji testified that he and Appellant concocted an alibi that they were at the intramural games at Texas College and that, when they left, Appellant was with his girlfriend, Adedeji was at home, and Walker and Johnson were "wherever." Adedeji stated unequivocally that he, Appellant, Johnson, and Walker committed the aggravated robbery in question.

*Corroborative Nonaccomplice Testimony*

In addition to Adedeji's testimony, the State also offered testimony concerning the airsoft pistol recovered during the police search of the Meadowbrook apartment complex.[5] Forensic DNA analyst Huma Nasir testified that she analyzed the DNA on the trigger of the airsoft pistol and that Appellant could not be excluded as a possible contributor of the DNA. Appellant later testified that he had previously handled the pistol, but denied owning it.

Moreover, the State offered a recorded interview between Tyler Police Officer Paul Robeson and Appellant. In the recorded interview, when Robeson asked Appellant about his whereabouts on March 30, 2009, Appellant responded that he was at school in class. Appellant told Robeson that, after class, he played intramural basketball until 10:00 p.m.,[6] after which he went to Francis's house, where he spent the rest of the night.

The State also elicited testimony from Jennifer Pillich, women's basketball coach at Texas College. Pillich testified that she was the intramural director. Pillich further testified that she was familiar with Appellant and that, according to her records, Appellant was not at Texas College playing sports on the night of March 30, 2009, until 10:00 p.m. Pillich stated that intramural sports are normally shut down by 8:30 p.m. at the latest.

Crashunda Wren testified that she knew Appellant, Adedeji, Johnson, and Walker. Wren further testified that she observed the four of them leaving the gym at Texas College together at approximately 7:45 p.m. on the night of the robbery.

Nona Jordan, who worked at the Varsity Place Apartments, testified that Appellant

---

3. Francis was Appellant's girlfriend.

4. Adedeji stated that Johnson was armed with a .45 caliber pistol and Appellant was armed with an airsoft pistol.

5. Adedeji moved into the Meadowbrook Apartments on April 1, 2009, as set forth in more detail later in this opinion.

6. Appellant later testified that he was confused during the interview with Robeson and mixed up the dates.

came to the office on March 31, 2009, to inquire if there was a way he could pay the default judgment to avoid being evicted. Jordan further testified that she told him the amount of the default judgment would have to be paid in full. Jordan stated that Appellant left, but later returned stating that he had discovered that he had money put away for his son with which he could pay a portion of the amount owed in cash. Jordan further stated that she informed Appellant that she could not accept a partial payment or a cash payment. Jordan noted that Appellant "kept talking about cash."

Judy Ludolph, assistant manager at the Meadowbrook apartment complex testified that Adedeji and Walker applied for an apartment on March 30, 2009. Ludolph further testified concerning a receipt that indicated that a deposit and one month's rent was paid on March 31, 2009, in the amount of $1,400. Ludolph stated that this amount was paid in cash. Ludolph further unequivocally identified Appellant as the person who entered the office at Meadowbrook Apartments and gave her the cash payment. Ludolph described the cash as being in "three bundles with rubber bands wrapped around it."

Akinbote also testified on the State's behalf. He testified that on April 3, 2009, he placed an anonymous phone call implicating Appellant, Adedeji, Walker, and Johnson as the perpetrators of the aggravated robbery of the Dollar General store. Akinbote further testified that he did not have actual knowledge of this fact, but he made the anonymous call in response to what he had heard from others. Later during trial, Appellant testified that during a phone call to his mother, he told his

mother to have his brother, Christian, contact Akinbote, and "to make sure he's got everything straight[.]" Akinbote testified that Appellant's brother contacted him two nights prior to the day on which he testified.

*Analyisis of Nonaccomplice Testimony and Evidentiary Sufficiency*

■ The foregoing nonaccomplice evidence indicates that Appellant was in need of money to avoid being evicted from his apartment. The evidence further indicates that Appellant could not be excluded as a contributor of the DNA recovered from the trigger of the airsoft pistol used in the robbery. In his interview with Robeson, Appellant gave the alibi corresponding to the alibi Adedeji testified he and Appellant had agreed to give. Moreover, a reasonable jury could conclude that the alibi Appellant gave Robeson was false since Pillich's records indicate that Appellant was not at Texas College playing sports on the night of March 30, 2009, until 10:00 p.m. and considering Pillich's testimony that intramural sports are normally shut down by 8:30 p.m. at the latest. Moreover, Wren testified that she observed the four friends leaving the gym at Texas College together at approximately 7:45 p.m. on the night of the robbery.[7] Furthermore, Jordan testified that Appellant sought to pay a portion of the default judgment to Jordan at Varsity Place Apartments on March 31, 2009, the day after the Dollar General store robbery. Jordan noted that Appellant "kept talking about cash." Ludolph unequivocally stated that Appellant paid her for the deposit and rent at the Meadowbrook Apartments on March 31, 2009, with $1,400 in bundles of cash. Finally, Akinbote testified that he made an anonymous

7. Wren's testimony places Appellant with Adedeji, Walker, and Johnson thirty-five minutes before the time the offense took place. *See Hernandez v. State*, 939 S.W.2d 173, 178 (Tex.Crim.App.1997) (court considered nonaccomplice evidence that appellant was with accomplice on night of offense about two hours before offense took place).

phone call to police on April 3, 2009, implicating Appellant as one of the perpetrators of the Dollar General store robbery. And while Akinbote testified that he did not have personal knowledge of this fact, a reasonable juror could conclude that Akinbote's testimony at trial differed from what he had previously told police as a result of pressure placed upon him during a phone call he received from Appellant's brother two nights before he testified concerning his "story."

After eliminating Adedeji's accomplice witness testimony from our consideration and conducting an examination of the nonaccomplice evidence, we conclude that the nonaccomplice evidence tends to connect Appellant to the offense sufficiently to corroborate Adedeji's testimony.

Further, having examined all of the aforementioned evidence in the light most favorable to the jury's verdict, we conclude that the jury could have reasonably determined beyond a reasonable doubt that Appellant committed the aggravated robbery in question. Therefore, we hold that the evidence is legally sufficient to support the trial court's judgment. Appellant's first issue is overruled.

### RECORDED PHONE CALL—CONFRONTATION CLAUSE

In his second issue, Appellant argues that the trial court erroneously admitted in violation of Appellant's Sixth Amendment rights a recording made by Tyler Police officers of a telephone call between Adedeji, Johnson, and Walker. During the phone call, the men discuss the Dollar General store robbery and make references to Appellant.

■ The Supreme Court held that the Sixth Amendment confrontation right applies not only to in-court testimony, but also to out-of-court statements that are testimonial in nature. See Crawford v. Washington, 541 U.S. 36, 51, 124 S.Ct. 1354, 1364, 158 L.Ed.2d 177 (2004); Wood v. State, 299 S.W.3d 200, 207 (Tex.App.-Austin 2009, pet. ref'd). The Confrontation Clause forbids the admission of testimonial hearsay unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross examine the declarant. Crawford, 541 U.S. at 68, 124 S.Ct. at 1374.

■ Whether a particular out-of-court statement is testimonial is a question of law. De La Paz v. State, 273 S.W.3d 671, 680 (Tex.Crim.App.2008). The Supreme Court in Crawford did not provide an exclusive definition of testimonial statements, but did hold that the Confrontation Clause applies to witnesses who bear testimony, which, it noted, is "typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. at 679. The Court further identified three kinds of statements that could be properly regarded as testimonial: (1) "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, testimony that the defendant was unable to cross examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," (2) "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Davis v. State, 169 S.W.3d 660, 666 (Tex.App.-Austin 2005), aff'd, 203 S.W.3d 845 (Tex.Crim.App.2006).

■ The primary focus in determining the threshold issue of whether a hearsay statement is "testimonial" is upon the objective purpose of the interview or inter-

rogation, not upon the declarant's expectations. *Davis v. Washington,* 547 U.S. 813, 822–23, 126 S.Ct. 2266, 2273–74, 165 L.Ed.2d 224 (2006); *De La Paz,* 273 S.W.3d at 680. Generally speaking, a hearsay statement is "testimonial" when the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *De La Paz,* 273 S.W.3d at 680. In such a situation, the person offering information is literally bearing testimony. *Id.* A statement is more likely to be testimonial if the person who heard, recorded, and produced the out-of-court statement at trial is a government officer. *See Davis,* 169 S.W.3d at 667. Casual remarks to acquaintances are generally nontestimonial. *Id.* If the person obtaining the statement is a governmental employee or police officer carrying out an investigation or prosecutional functions, the statement is "testimonial." *Id.* (citing *Crawford,* 541 U.S. at 53, 124 S.Ct. at 1365).

### *"Testimonial"*

■ The State argues that because an objective person in Walker's and Johnson's positions would not reasonably believe that these statements would later be used at trial, the statements are not testimonial. We stress that the primary focus in determining whether a hearsay statement is "testimonial" is upon the objective purpose of the interview or interrogation, not upon the declarant's expectations. *See De La Paz,* 273 S.W.3d at 680.

Here, the record reflects that Adedeji confessed to police that he was one of the perpetrators of the Dollar General store robbery and, further, informed police that Walker, Johnson, and Appellant were the other participants. Tyler Police Officer Greg Roberts testified that he arranged

for a phone call to be placed by Adedeji from the police station and that the phone call was recorded. Roberts further testified that the phone call was made by Adedeji under the supervision of Tyler police officers and that Walker and Johnson spoke to Adedeji apparently unaware of the circumstances under which the call was placed. Roberts stated that Adedeji was not told what to say. Rather, according to Roberts, Adedeji was told to "call him and talk."

Viewing the circumstances under which Walker's and Johnson's declarations were made, we conclude that an objective witness would reasonably believe that these statements would be available for use at a later trial. We further conclude that these circumstances objectively indicate that the primary purpose of the recorded phone call was to establish or prove the past events relating to the Dollar General store robbery that would be potentially relevant to later criminal prosecution. Accordingly, we hold that Walker's and Johnson's statements were "testimonial" under the Confrontation Clause and should not have been admitted over Appellant's objection.

### *Harm Analysis*

■ A Confrontation Clause violation is subject to a harmless error analysis. *See Lilly v. Virginia,* 527 U.S. 116, 140, 119 S.Ct. 1887, 1901, 144 L.Ed.2d 117 (1999); *Coy v. Iowa,* 487 U.S. 1012, 1021, 108 S.Ct. 2798, 2803, 101 L.Ed.2d 857 (1988); *Davis,* 169 S.W.3d at 672. We must reverse the conviction when Confrontation Clause error is presented unless we can determine beyond a reasonable doubt that the error did not contribute to the conviction. *Davis,* 169 S.W.3d at 672; *see also* TEX.R.APP. P. 44.2(a).

■ In *Shelby v. State,* 819 S.W.2d 544, 547 (Tex.Crim.App.1991), the Texas Court of Criminal Appeals adopted the Supreme Court's analysis in *Delaware v.*

*Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986), for assessing harm in Confrontation Clause cases. *Davis,* 169 S.W.3d at 672. The *Van Arsdall* analysis is a three-pronged test. *Davis,* 169 S.W.3d at 672. First, the reviewing court must assume that the damaging potential of the cross examination was fully realized. *Id.* Second, with that assumption in mind, the court must review the error in connection with the following factors: (1) the extent for cross examination otherwise permitted; (2) the importance of the witness's testimony in the state's case; (3) whether the testimony was cumulative; (4) the presence or absence of evidence corroborating or contradicting material points of the witness's testimony; (5) and the overall strength of the state's case. *Id.* Finally, in light of the first two prongs, the court determines if the error was harmless beyond a reasonable doubt. *Id.* at 672–73 (citing *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438).

In the instant case, during the pertinent portion of the phone call at issue, the following conversation transpired between Adedeji and Walker as well as Adedeji and Johnson:

> [MARKQUETTE] ADEDEJI: Y'all n*ggas ain't talked to Brian? Anybody talked to Brian?
>
> MARCUS WALKER: I just talked to (incomprehensible). Talked to that n*gga.
>
> . . . .
>
> [MARKQUETTE] ADEDEJI:
>
> . . . .
>
> And then they brought me—got me into a little conference room and had the pictures and sh*t. N*gga, they had like 30 pictures of bullsh*t.
>
> CLINT JOHNSON: Of who?
>
> [MARKQUETTE] ADEDEJI: They had pictures.
>
> CLINT JOHNSON: Of us?
>
> [MARKQUETTE] ADEDEJI: Of the robbery, us. They had your whole body in one of them, homes.
>
> CLINT JOHNSON: Dang.
>
> [MARKQUETTE] ADEDEJI: That's how they seen the shoes and sh*t.
>
> CLINT JOHNSON: Oh, yeah. I still seen that one.
>
> [MARKQUETTE] ADEDEJI: Oh, you seen that?
>
> CLINT JOHNSON: I remember seeing that one.
>
> . . . .
>
> [MARKQUETTE] ADEDEJI: Like, sh*t, I still got to talk to my lawyer and sh*t. I just told them, sh*t, like make sure you tell that n*gga Brian and sh*t—I just told them, sh*t. They said, well, we had him (incomprehensible). We was at the game. Like, sh*t, me and Brian was at the game. I dropped him off at Kay Francis'[s] house and sh*t. I told them, sh*t, I was at the game. I was like, sh*t, n*ggas, y'all didn't ride home with me. Y'all just— y'all was at the game but, sh*t, I guess y'all left or whatever and y'all showed up at the house later.
>
> CLINT JOHNSON: Yeah.
>
> [MARKQUETTE] ADEDEJI: Because, sh*t, I don't know. My lawyer might call. Y'all n*ggas might have to talk to that n*gga just to corroborate the story and sh*t, make sure I ain't lying or no sh*t like that.
>
> CLINT JOHNSON: Yeah.

In applying the *Van Arsdall* factors to the facts of the instant case, we conclude that the recorded phone call at issue was not vital to the State's case. Even without it, the State established the elements of the offense. Walker merely acknowledges speaking with Appellant, while Johnson tacitly acknowledges Appellant's

involvement inasmuch as he does not decry Adedeji's vague suggestion of it. But Adedeji's mentioning of Appellant does not directly implicate him. Rather, he brings up Appellant's name while discussing the robbery and suggests Appellant as a potential alibi. By and large, the recorded conversation does not cement Appellant's involvement in the robbery as effectively as Adedeji's own testimony.[8] Johnson's acknowledgment can be best described as cumulative, albeit less clear, of Adedeji's testimony. Moreover, the same evidence that corroborates Adedeji's testimony can be used to corroborate Johnson's statements during the recorded phone conversation. Finally, the State's case against Appellant was strong. Adedeji's testimony that Appellant committed the armed robbery along with the corroborating evidence set forth above was undoubtedly sufficient to support the jury's finding of guilt.

Applying the *Van Arsdall* analysis, we conclude beyond a reasonable doubt that the error did not contribute to the conviction or punishment assessed. There is no reasonable likelihood that the error, if any, materially affected the jury's deliberations. *See Davis,* 169 S.W.3d at 673. Accordingly, we hold that the trial court's error in admitting the recorded phone conversation at issue was not harmful to Appellant.

Appellant's second issue is overruled.

### DENIAL OF JURY INSTRUCTIONS

 In his third issue, Appellant argues that the trial court erred in denying his requests to give an accomplice jury charge concerning Johnson and Walker.

 A defendant is entitled to a jury instruction on any defense issue raised by the evidence. *See Granger v. State,* 3 S.W.3d 36, 38 (Tex.Crim.App. 1999). When the evidence raises a defense issue and the defendant properly requests a jury charge on the issue, the trial court must submit the charge. *See Muniz v. State,* 851 S.W.2d 238, 254 (Tex.Crim.App. 1993). The accomplice witness rule applies only to "testimony" of an accomplice. *See* TEX.CODE CRIM. PROC. ANN. art. 38.14. For purposes of Article 38.14, "testimony" refers to "[e]vidence given by a competent witness under oath or affirmation; as distinguished from evidence derived from writings, and other sources." *Bingham v. State,* 913 S.W.2d 208, 210 (Tex.Crim.App. 1995); *White v. State,* 982 S.W.2d 642, 649 (Tex.App.-Texarkana 1998, pet. ref'd).

 In the case at hand, neither Walker nor Johnson gave in-court testimony under oath or affirmation. Neither their out-of-court statements nor the prosecuting attorney's reference during Appellant's trial on punishment [9] to Walker's prior testimony amounts to either Walker's or Johnson's testifying as an accomplice under Article 38.14. Thus, we hold that the trial court did not err in refusing to submit accomplice witness jury charge instructions concerning Johnson or Walker. Appellant's third issue is overruled.

### REMOTE TESTIMONY OF NONA JORDAN— CONFRONTATION CLAUSE

In his fourth issue, Appellant argues that the trial court violated his Due Process and Sixth Amendment Rights by permitting Jordan to testify via a web camera

---

8. While it could be argued that it corroborates Adedeji's testimony, we questioned its evidentiary value to such an extent that we declined to rely on it as corroborating evidence in our analysis of Appellant's first issue.

9. The accomplice witness rule does not apply to a trial on punishment. *See Vasquez v. State,* 56 S.W.3d 46, 48 (Tex.Crim.App.2001) (Article 38.14 "requires corroboration of accomplice testimony for a conviction only.").

computer conferencing system from a remote location.

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. This right to confrontation was made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig,* 497 U.S. 836, 845, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990); *Stevens v. State,* 234 S.W.3d 748, 782 (Tex.App.-Fort Worth 2007, no pet.). The Confrontation Clause reflects a preference for face-to-face confrontation at trial, but that preference must occasionally give way to considerations of public policy and the necessities of the case. *Craig,* 497 U.S. at 849, 110 S.Ct. at 3165; *Stevens,* 234 S.W.3d at 782. The salutary effects of face-to-face confrontation include (1) the giving of testimony under oath, (2) the opportunity for cross-examination, (3) the ability of the factfinder to observe demeanor evidence, and (4) the reduced risk that a witness will wrongfully implicate an innocent defendant when testifying in his presence. *See Craig,* 497 U.S. at 845–46, 110 S.Ct. at 3163–64; *Stevens,* 234 S.W.3d at 782.

Appellant emphasizes the language in *Craig* that the preference for face-to-face confrontation at trial must occasionally "give way to considerations of public policy." Appellant contends that the fact that Jordan suffered from stage IV ovarian cancer alone is not the sort of strong public policy contemplated by the Supreme Court in *Craig.*

In *Stevens,* the trial court permitted remote testimony via a closed circuit, two-way television system so that Clyde Ward, an elderly witness, who lived in Colorado and was suffering from heart problems, would not have to travel to Texas to testify. *See Stevens,* 234 S.W.3d at 781. Ward's cardiologist wrote a letter to the trial court explaining that during the year preceding the trial, Ward had been evaluated and hospitalized multiple times for decompensated congestive heart failure, gastrointestinal bleeding, atrial fibrillation, and vascular disease. *Id.* The doctor stated that Ward's health status was "actually quite tenuous," that he had a history of coronary artery disease, that he had undergone bypass surgery, and that he was at high risk due to his atrial fibrillation and other comorbidities. *Id.* The doctor was very concerned that if Ward were required to testify in such an intense and stressful trial, the experience would have negative ramifications on Ward's health. *Id.* She explained that, in her professional opinion, "Mr. Ward could very well suffer from a health standpoint." *Id.* She requested that, if at all possible, he be excused for health reasons from participating in the trial. *Id.* She later wrote a second letter stating that she was comfortable, from a health-risk standpoint, with Ward providing testimony via closed circuit television from the county where she was treating him. *See id.*

The trial court in *Stevens* heard argument on the State's motion regarding Ward's remote testimony. *Id.* At the conclusion of the hearing, the trial court stated as follows:

> [W]e have set up a system wherein there's a podium in the middle of the courtroom from which the attorneys can question the witness. There's a laptop

computer set up that will allow [Stevens] and the defense attorney to view the witness as well as a probably 20–some–odd–inch television screen that will allow them to view the witness as well and the jury can view the witness. And the feed allows the witness, based upon the way it's set up, to be able to see the person questioning him as well as the Defense counsel table. And the person questioning him is not blocking or impeding the witness's view of the counsel table where the Defense attorney Counsel and the Defense Attorney's assistant can be seen.

And so that should allow for contemporaneous transmission and contemporaneous cross-examination and should allow the Defendant to be able to see the witness and the witness to be able to see the Defendant and the jury to be able to see the cross-examination and the witness contemporaneous with it taking place.

*Id.* at 781–82. The court of appeals agreed with the trial court's decision. *Id.* at 782. The court noted that the two-way closed circuit television procedure utilized by the State to present Ward's testimony preserved all of the necessary characteristics of in-court testimony: Ward was sworn; he was subject to full cross-examination; he testified in full view of the jury, trial court, and defense counsel; and he gave this testimony under the eye of Stevens herself. *See id.* The court further noted that Ward's tenuous health situation—documented by letters from his treating cardiologist—was an exceptional circumstance that warranted permitting his testimony by two-way closed circuit television. *See id.* (citing *United States v. Gigante*, 166 F.3d 75, 81–82 (2d Cir.1999) (holding that upon finding of exceptional circumstances, such as when a witness has a fatal illness and is part of Federal Witness Protection Program, trial court may allow a witness to testify via two-way closed circuit television when this furthers interest of justice)).

In the instant case, Jordan testified that she was suffering from stage IV ovarian cancer and was undergoing chemotherapy. Jordan further testified that her doctors felt that if she had to travel the distance from McKinney, Texas, to Tyler, Texas, for the purpose of testifying at trial, doing so would be dangerous for her health. Jordan stated that she was able to see the prosecuting attorney, Appellant's trial counsel, and Appellant. The trial court found that there was contemporaneous transmission and cross examination available, that Appellant was able to see Jordan, and that Jordan was able to see the attorneys for the State, the attorney for Appellant, and Appellant himself. The court further found that the jury would be able to observe Jordan on a large screen, hear her testimony, and observe her demeanor.

In his brief, Appellant notes that the State offered no testimony from Jordan's doctors concerning her condition. However, we note that Appellant made no hearsay objection to Jordan's testimony concerning her doctors' concerns about her traveling to testify. As in *Stevens*, the computer video conferencing system in the instant case used to present Jordan's testimony preserved all of the necessary characteristics of in-court testimony: Jordan was sworn; she was subject to full cross examination; she testified in full view of the jury, the trial court, and defense counsel; and she gave her testimony under the eye of Appellant himself. *See Stevens*, 234 S.W.3d at 782. Further, Jordan's serious health situation was an exceptional circumstance that warranted permitting her testimony by a computer video conferencing system. Accordingly, we hold that the trial court did not violate Appellant's Sixth

Amendment rights by allowing Jordan to testify remotely via a computer video conferencing system. Appellant's fourth issue is overruled.

### INEFFECTIVE ASSISTANCE OF COUNSEL

In his fifth and sixth issues, Appellant argues that he received ineffective assistance of counsel. Specifically, Appellant contends that his trial counsel was ineffective for eliciting testimony from him that resulted in his waiving his attorney-client privilege, thereby permitting the State to cross examine him concerning privileged communications. Appellant also argues that his trial counsel was ineffective for his failure to object to the State's improper comment during closing argument asking the jury to put themselves in the role of the victims in the instant case.

Claims of ineffective assistance of counsel are evaluated under the two step analysis articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The first step requires the appellant to demonstrate that trial counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *See Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065. To satisfy this step, the appellant must identify the acts or omissions of counsel alleged to be ineffective assistance and affirmatively prove that they fell below the professional norm of reasonableness. *See McFarland v. State*, 928 S.W.2d 482, 500 (Tex.Crim.App.1996). The reviewing court will not find ineffectiveness by isolating any portion of trial counsel's representation, but will judge the claim based on the totality of the representation. *See Strickland*, 466 U.S. at 695, 104 S.Ct. at 2069.

To satisfy the *Strickland* standard, the appellant is also required to show prejudice from the deficient performance of his attorney. *See Hernandez v. State*, 988 S.W.2d 770, 772 (Tex.Crim.App.1999). To establish prejudice, an appellant must prove that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. It is not enough for the appellant to show that the errors had some conceivable effect on the outcome of the proceedings. *See Burruss v. State*, 20 S.W.3d 179, 186 (Tex. App.-Texarkana 2000, pet. ref'd). Rather, he must affirmatively demonstrate that there is a reasonable probability that, but for his attorney's errors, the jury would have had a reasonable doubt about his guilt. *Id.*

In any case considering the issue of ineffective assistance of counsel, we begin with the strong presumption that counsel was effective. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex.Crim.App.1994). We must presume counsel's actions and decisions were reasonably professional and were motivated by sound trial strategy. *See id.* Appellant has the burden of rebutting this presumption by presenting evidence illustrating why his trial counsel did what he did. *See id.* Appellant cannot meet this burden if the record does not affirmatively support the claim. *See Garza v. State*, 213 S.W.3d 338, 347–48 (Tex.Crim.App.2007) (where appellant argued ineffective assistance because trial counsel failed to offer any mitigating evidence during punishment phase of trial, without record indicating reasons for a trial counsel's actions or intentions, court presumed trial counsel had reasonable trial strategy); *Jackson v. State*, 973 S.W.2d 954, 955 (Tex.Crim.App.1998) (inadequate record on direct appeal to evaluate whether trial counsel provided ineffective assistance); *Phetvongkham v. State*, 841 S.W.2d 928, 932 (Tex.App.-Corpus Christi 1992, pet. ref'd, untimely filed) (inadequate record to evaluate ineffective assistance claim); *see also Beck v. State*, 976 S.W.2d

265, 266 (Tex.App.-Amarillo 1998, pet. ref'd) (inadequate record for ineffective assistance claim, citing numerous other cases with inadequate records to support ineffective assistance claim). A record that specifically focuses on the conduct of trial counsel is necessary for a proper evaluation of an ineffectiveness claim. *See Kemp v. State,* 892 S.W.2d 112, 115 (Tex.App.-Houston [1st Dist.] 1994, pet. ref'd).

Appellant's burden on appeal is well established. *See Saenzpardo v. State,* No. 05–03–01518–CR, 2005 WL 941339, at *1 (Tex.App.-Dallas 2005, no pet.) (op., not designated for publication). Before being condemned as unprofessional and incompetent, defense counsel should be given an opportunity to explain his or her actions. *See Bone v. State,* 77 S.W.3d 828, 836 (Tex.Crim.App.2002). Thus, absent a properly developed record, an ineffective assistance claim must usually be denied as speculative, and, further, such a claim cannot be built upon retrospective speculation. *Id.* at 835.

■ Here, Appellant sets forth in his brief that his attorney's performance at trial fell below the professional norm because he asked Appellant questions regarding privileged communications[10] that resulted in Appellant's waiver of his attorney-client privilege. As a result, the State was permitted to question Appellant concerning privileged communications with his trial counsel, including whether Appellant had reviewed the transcript of Walker's previous testimony.[11] Yet, the record before us is silent about trial counsel's strategy underlying why he questioned Appellant about the fact that Appellant and he discussed that Appellant had some friends

that probably gotten him into a lot of trouble.

Appellant further contends that his attorney's performance at trial fell below the professional norm because he declined to object to the State's closing jury argument in which the prosecuting attorney stated as follows:

> Can you imagine how slow the time is going (snapping fingers) when you have this in your face? Think about that. You ever been in an emergency and you're waiting on the police? It may have been four minutes, but it seemed like it was an hour, because you're in distress.

> But imagine the distress of Brian Paul, Markquette, Clint, and Marcus Walker having their—your life in their hands.

Once again, the record before us is silent about trial counsel's strategy underlying why he declined to object.

■ Normally, a silent record cannot defeat the strong presumption of effective assistance of counsel. *See Garza,* 213 S.W.3d at 348; *Thompson v. State,* 9 S.W.3d 808, 813–14 (Tex.Crim.App.1999); *but see Andrews v. State,* 159 S.W.3d 98, 102–03 (Tex.Crim.App.2005) (reversing a conviction "in a rare case" on the basis of ineffective assistance of counsel when trial counsel did not object to a misstatement of law by the prosecutor during argument).

In *Andrews,* the same prosecutor who filed a motion to cumulate the sentences in four counts of sexual abuse later argued to the jury, "You give him 20 years in each case, it's still just 20 years. It's still not 80. You can give different amounts if you want. You can give 20, 10, 10, five, it's

---

**10.** Specifically, Appellant's trial counsel asked Appellant if he and trial counsel had discussed the fact that Appellant had some friends that probably got him into a lot of trouble.

**11.** The prosecuting attorney stated, as part of a question posed to Appellant, that "Marcus Walker sat on the witness stand and said you did it, too." Appellant responded that he did not know that.

still just 20." *Id.* at 100. The appellant's trial counsel did not object to the prosecutor's misstatement of the law. *Id.* The trial court ultimately granted the State's motion to cumulate the sentences and imposed a combined prison sentence of seventy-eight years. *Id.* The court concluded that the argument left the jury with the incorrect impression that the appellant's sentences could not be stacked and that the appellant would serve no more than twenty years in prison for all four counts. *Id.* at 103. Therefore, the court held that, under the "extremely unusual circumstances of [the] case," the record contained all of the information it needed to conclude that there could be "no reasonable trial strategy for failing to object" to the prosecutor's misstatement of the law. *Id.*

The "extremely unusual circumstances" present in *Andrews* are not present in the case at hand. Failing to object to a misstatement of the law that is detrimental to one's client when the harm is so clearly presented by the record on appeal is quite different from determining what testimony to elicit or not to elicit as a matter of trial strategy. *Cf. Garza,* 213 S.W.3d at 348; *Saenzpardo,* 2005 WL 941339, at *2; *see Nabors v. State,* No 12–00–00371–CR, 2002 WL 1362470, at *7 (Tex.App.-Tyler June 21, 2002, pet. ref'd) (not designated for publication) (no record from which appellate court could determine whether counsel acted in reasonably professional manner in not calling witnesses to mitigate punishment). The same can be said for a trial counsel's declining to object to allegedly improper jury argument. *Cf. Cueva v. State,* 339 S.W.3d 839, 892 (Tex.App.-Corpus Christi 2011, pet. ref'd) (trial counsel's failure to object to prosecutor's closing argument was reasonable trial strategy and not ineffective assistance). To the contrary, in *Andrews,* trial counsel's reasons, if any, were unnecessary to resolve the ineffective assistance of counsel claim. *See Berry v. State,* No. 05–04–01161–CR,

2005 WL 1515512, at *3 (Tex.App.-Dallas 2005, no pet.) (op., not designated for publication).

Having reviewed the record in the instant case, we conclude that the facts before us are distinguishable from the facts in *Andrews.* Thus, we decline to hold that the record before us contains all of the information needed for us to conclude that there could be no reasonable trial strategy for Appellant's counsel's actions or inactions that Appellant contends amount to ineffective assistance. Therefore, we hold that Appellant has not met the first prong of *Strickland* because the record does not contain evidence concerning Appellant's trial counsel's reasons for choosing the courses he did. As a result, Appellant cannot overcome the strong presumption that his counsel performed effectively.

Appellant's fifth and sixth issues are overruled.

### DISPOSITION

Having overruled Appellant's first, second, third, fourth, fifth, and sixth issues, we *affirm* the trial court's judgment.