# NO. 12-11-00267-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *SHARIEFF DEAN,*<br>*APPELLANT* | § | *APPEAL FROM THE 241ST* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *SMITH COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Appellant Sharieff Dean appeals his conviction for murder and presents six issues for our consideration. We affirm.

## BACKGROUND

Appellant was charged by indictment with the murder of Ronnie Kemp. The indictment alleged that Appellant intentionally and knowingly caused Kemp's death by shooting him with a firearm, and by striking Kemp with his hands and other objects, some of which were "unknown to the grand jury." The indictment alleged further that Appellant had used or exhibited a deadly weapon (a firearm) during the commission of or immediate flight from the offense, and that he had previously been convicted of two felony offenses. The State later filed a "Notice of Intent to Seek Higher Punishment Based on Prior Convictions," which referred to two prior felony convictions for possession of a controlled substance. The trial court signed an order allowing the enhancements.

Appellant pleaded "not guilty" to the offense of murder, "not true" to the first enhancement allegation in the State's notice, and "true" to the second. The matter proceeded to a jury trial on

both guilt and punishment.

The evidence at trial showed that on the night of July 5, 2010, Tyler police were dispatched to Peach Park in response to a call from Johnnie Kemp. Johnnie had gone to the park to look for her brother, Ronnie Kemp, after being informed by his wife, Rochelle, that she believed something had happened to Kemp at the park. When Johnnie arrived at the park, she called her brother's name several times, and called 911 when he did not answer. When the police arrived, they searched the park and soon located Kemp's body. According to the autopsy report, he had been shot six times and suffered multiple trauma injuries. Early in the investigation, the police identified several suspects, including Appellant. Appellant is married to Kemp's sister, Debbie. Their daughter, Amie Dean, is Kemp's niece. Amie was also identified as a suspect along with several others.

Appellant and Kemp were both drug dealers, but Appellant learned that Kemp had become a confidential informant. This enraged Appellant, and he made no secret of his hatred for Kemp. He described him as a "snitch" and told Debbie that Kemp "needed to be dealt with." After Debbie realized Appellant was serious, she warned her brother on several occasions because she wanted him to "be safe." Appellant related his hatred of Kemp to Lynetter Edwards, who was a friend of both men and had previously purchased drugs from them. Edwards testified that Appellant wanted Kemp dead because he was a "snitch." She described Appellant's hatred of Kemp as "intense." Edwards also testified that Appellant told her he wanted to shoot Kemp in the head and that he "couldn't believe" Kemp was still walking around.

Amie had been staying with Kemp for a short time before the murder. On the evening before the murder, Ronnie told her to leave, but he would not allow her to take all of her personal items with her. She informed Appellant, who had an angry phone call with Kemp on the day of the murder. Appellant then went to see someone that had previous problems with Kemp being a confidential informant. The purpose of the visit was to talk to the person, later determined to be Demetrius Kellum, about "putting a hit" on Kemp.

That night, Kemp traveled to Peach Park for a meeting with Appellant. Appellant, Amie, Kellum, and four other individuals arrived first and hid in the bushes along the path where Kemp would pass. When he approached, Amie stepped out of the bushes and started talking to him. Moments later, the others stepped out of the bushes, and all but one of them started beating him.

2

Kemp was soon on the ground, and Appellant shot him six times, including once in the head.

The jury found Appellant guilty of the offense of murder, found both enhancement allegations "true," and sentenced Appellant to imprisonment for life.   Appellant filed a motion for new trial, which was overruled by operation of law.   This appeal followed.


## SELECTION OF GRAND JURORS

In his first issue, Appellant contends that the grand jury returning the indictment was unconstitutionally impanelled.

### Applicable Law

Texas law provides for two methods of selecting grand jurors.   The first method, called a "key man" system, allows a district court judge to appoint three to five "persons to perform the duties of jury commissioners."   TEX. CODE CRIM. PROC. ANN. art. 19.01(a) (West 2005).   Those commissioners select the grand jurors.   *See id*. art. 19.06 (West Supp. 2012).   In doing so, the commissioners "shall, to the extent possible, select grand jurors who the commissioners determine represent a broad cross-section of the population of the county, considering the factors of race, sex, and age."   *Id*.

The other method of selecting jurors is the randomized procedure used to select jurors for civil cases.   *See id*. art. 19.01(b) (West 2005).

### Analysis

Texas law requires that a challenge to the array of jurors must be made before the "grand jury has been impaneled," and "[i]n no other way shall objections to the qualifications and legality of the grand jury be heard."   *Id*. art 19.27 (West 2005).   The court of criminal appeals has held that a motion to quash can be filed before trial commences if a "challenge on impanelment is not possible."   *Muniz v. State*, 573 S.W.2d 792, 796 (Tex. Crim. App. 1978).   As an example, the court cited a case where the offense was committed after the grand jury was impaneled.   *Id*. (citing *Ex parte Covin*, 161 Tex. Crim. 320, 322, 277 S.W.2d 109, 111 (Tex. Crim. App. 1955)). But the court was clear that "[i]f the defendant has an opportunity to challenge the array when it is impaneled and does not do so, he may not challenge it at a later date."   *Id*.

Here, Appellant filed a motion to quash the indictment, and the trial court considered the motion at a pretrial hearing.   However, Appellant did not argue at the hearing that he could not

have challenged the array when it was impaneled. *See id*. Because Appellant failed to show that he could not have challenged the array when it was impaneled, his motion to quash does not preserve this issue for our review. *See* TEX. CODE CRIM. PROC. ANN. art. 19.27; *Muniz*, 573 S.W.2d at 796; *Caraway v. State*, 911 S.W.2d 400, 401-02 (Tex. App.–Texarkana 1995, no pet.). But Appellant would not prevail even if we were to consider his constitutional argument.

The Supreme Court has reviewed the Texas "key man" system on several occasions. In *Smith v. Texas*, 311 U.S. 128, 61 S. Ct. 164, 85 L. Ed. 84 (1940), the Court held that "the Texas statutory scheme is not in itself unfair; it is capable of being carried out with no racial discrimination whatsoever. But by reason of the wide discretion permissible in the various steps of the plan, it is equally capable of being applied in such a manner as practically to proscribe any group thought by the law's administrators to be undesirable."[1] *Id.*, 311 U.S. at 130-31, 61 S. Ct. at 165. Although the Court found the system to be facially constitutional, and capable of being carried out in a way that did not violate equal protection, the Court held that the system was unconstitutional as applied in that case because a statistical analysis of the race of jurors who actually served belied a race neutral application of the statute. *Id*., 311 U.S. at 131-32, 61 S. Ct. at 166.

In *Hill v. Texas*, 316 U.S. 400, 62 S. Ct. 1159, 86 L. Ed. 1559 (1942), the Supreme Court held that the Equal Protection Clause was violated by a grand jury selection scheme that excluded African Americans from serving. In 1977, the Court again recognized the "facial constitutionality of the key-man" system, but granted relief for an "as applied" equal protection violation. *See Castaneda v. Partida*, 430 U.S. 482, 497, 500-01, 97 S. Ct. 1272, 1281, 1283, 51 L. Ed. 2d 498 (1977); *see also Ovalle v. State*, 13 S.W.3d 774, 778 (Tex. Crim. App. 2000) (citing *Partida*, 430 U.S. at 497, 97 S. Ct. at 1281 ("The Supreme Court has held that the commissioner-based system, while facially constitutional, is susceptible to abuse.").

Appellant does not make an "as applied" claim in this case and offered no evidence to show that the grand jurors were selected in a discriminatory fashion. Instead, Appellant argues, despite the Supreme Court's rulings to the contrary, that the "key man" system is facially unconstitutional.

---

[1] The scheme as it existed at that time was similar to the current method of selecting grand jurors. But the goal of a "cross-section" of the community required only that the jurors were selected from "different parts of the county." *Smith*, 311 U.S. at 131 n.5, 61 S. Ct. at 165 n.5.

This is so, he argues, because the statute directs grand jury commissioners to consider race in selecting grand jurors. *See* TEX. CODE CRIM. PROC. ANN. art. 19.06 (West Supp. 2012). Appellant contends this is a racial classification that requires strict scrutiny as to whether the policy serves a compelling governmental interest. *See, e.g.*, **Grutter v. Bollinger**, 539 U.S. 306, 333, 123 S. Ct. 2325, 2342, 156 L. Ed. 2d 304 (2003) ("Even in the limited circumstance when drawing racial distinctions is permissible to further a compelling state interest, government is still 'constrained in how it may pursue that end: the means chosen to accomplish the [government's] asserted purpose must be specifically and narrowly framed to accomplish that purpose."). He also assumes, for purposes of argument, that ensuring a fair cross-section of the county population is represented on the grand jury is a compelling governmental interest but argues that the key man system is not narrowly tailored to meet that interest.

No court has sustained a facial challenge to Article 19.06. However, it could be that commissioners in a given case would impose some type of informal quota system. *See* **Cassell v. Texas**, 339 U.S. 282, 286-87, 70 S. Ct. 629, 631-32, 94 L. Ed.839 (1950) (holding that a system where not more than one African American person would be selected for each grand jury was impermissible). Or it could be that they would take other measures to ensure that the statistical anomalies present in the demographics of their own circle of acquaintances were not replicated in the selection process. *See* **id**., 339 U.S. at 290, 70 S. Ct. at 633. But Appellant brings a facial challenge to the statute, which is a claim that the statute is unconstitutional "on its face" and is a claim that the statute, by its terms, always operates unconstitutionally. *See* **United States v. Salerno**, 481 U.S. 739, 745, 107 S. Ct. 2005, 2100, 95 L. Ed. 2d 697 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."); **Gillenwaters v. State**, 205 S.W.3d 534, 536 n.2 (Tex. Crim. App. 2006). But it is certainly possible that a commissioner would employ a random system, or a relatively random system–selecting, for example, the first three people on each page produced by the clerk–or simply understand the statute to be an admonition not to discriminate in the selection of grand jurors. There is no requirement that commissioners not use a random system if they determine that such a system would discharge their duty to find grand jurors who represent a broad cross-section of the community. In other words, the statute is capable of being implemented in a way that Appellant

5

agrees–random selection–would pass constitutional muster. Accordingly, even if Appellant had preserved this complaint for our consideration, we could not conclude that Article 19.06 is facially unconstitutional.

We overrule Appellant's first issue.

**REHABILITATION OF POTENTIAL JURORS**

In his second issue, Appellant contends the trial court reversibly erred in not striking venirepersons 4 and 5 or, alternatively, by denying his request for additional peremptory strikes. He argues that venirepersons 4 and 5 were subject to challenge for cause once they stated they would convict Appellant if they thought he was "probably guilty." Appellant argues further that the trial court could not reasonably have believed that the law had not been fully or accurately explained to the two venire members. Therefore, Appellant concludes, the trial court's additional questioning was solely for the benefit of the State, improper, and harmful.

**Standard of Review and Applicable Law**

The conduct of the voir dire examination rests within the sound discretion of the trial court. *Dowden v. State*, 758 S.W.2d 264, 274 (Tex. Crim. App. 1988) (en banc). When reviewing a trial court's decision to grant or deny a challenge for cause, we look at the entire record to determine if there is sufficient evidence to support the court's determination. *Gonzales v. State*, 353 S.W.3d 826, 831 (Tex. Crim. App. 2011). We review the ruling with considerable deference, particularly when the prospective juror's responses are vacillating, unclear, or contradictory. *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007); *Threadgill v. State*, 146 S.W.3d 654, 667 (Tex. Crim. App. 2004). We do so because the trial court is in the best position to evaluate a prospective juror's demeanor, tone of voice, and responses. *Smith v. State*, 297 S.W.3d 260, 268 (Tex. Crim. App. 2009); *Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002). We reverse the trial court's ruling only if the record shows a clear abuse of discretion. *Hernandez v. State*, 390 S.W.3d 310, 317 (Tex. Crim. App. 2012).

The defense may challenge a prospective juror for cause if the juror has "a bias or prejudice in favor of or against the defendant," or "a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which the defendant is being prosecuted or as a mitigation thereof or of the punishment therefor."

6

TEX. CODE CRIM. PROC. ANN. art. 35.16(a)(9), (c)(2) (West 2006). Thus, the defense may challenge for cause a potential juror who is unable to require the state to prove each element of the offense beyond a reasonable doubt. *Wheatfall v. State*, 882 S.W.2d 829, 833 (Tex. Crim. App. 1994) (en banc). The test of whether the prospective juror should or should not be dismissed is whether the bias or prejudice would impair his ability to carry out his oath and instructions in accordance with the law. *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009). Before a prospective juror may be excused for cause on this basis, the law must be explained to him, and he must be asked whether he can follow that law, regardless of his personal views. *Id*.

Once a potential juror expressly admits his bias against a phase of law upon which the defense is entitled to rely, a sufficient foundation has been laid for a challenge for cause. *Cardenas v. State*, 325 S.W.3d 179, 184-85 (Tex. Crim. App. 2010). The opposing party or the trial court may then examine the potential juror further to ensure that he fully understands and appreciates the position he is taking. *Id*. at 185. But unless there is further clarification or the potential juror vacillates, the trial court must grant a challenge for cause if the potential juror expresses that he cannot hold the state to its burden of proof. *See Wheatfall*, 882 S.W.2d at 833-35.

## Voir Dire

Before the voir dire began, the trial court gave the prospective jurors some general instructions. Concerning "reasonable doubt," the court instructed the venire as follows:

> [Y]ou've heard me use that term "beyond a reasonable doubt[,]" which is a term I'm sure you're all familiar with. That term "beyond a reasonable doubt," we've heard it all our lives. The term "beyond a reasonable doubt" does not really have a definition now in Texas. It's left to each individual juror, okay, to determine whether or not they are convinced beyond a reasonable doubt that the State has proven the defendant guilty and proven each allegation of the indictment beyond a reasonable doubt. The State does not have to prove the defendant guilty beyond all possible doubt, but the State must eliminate any reasonable doubt as to the defendant's guilt before the jury can find the defendant guilty.[2]

The prosecutor explained to the venire that beyond a reasonable doubt is "not beyond a shadow of a doubt" and "not beyond all doubt." He also told them that "[y]ou can actually convict someone

---

[2] The court of criminal appeals has held that "the better practice is to give no definition of reasonable doubt at all to the jury." *Paulson v. State*, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000).

of a criminal offense and have a doubt," but "[w]hat you can't have is a reasonable doubt." The prosecutor reminded the venire that "what beyond [a] reasonable doubt is, it's really up to you, it really is. Y'all are the individuals that dictate that."

In his discussion of reasonable doubt, defense counsel asked one of the venire members what reasonable doubt meant to her. Before she answered, counsel reiterated that

> Judge isn't going to give you any instructions – he's going to give you a lot of instructions, but he isn't going to tell you what a reasonable doubt is. But you get to have your own definition of reasonable doubt, and each of you, as you go back in that jury room, say this is what I believe reasonable doubt is.

After hearing from two other venire members, counsel then moved on to discuss "escalating levels of proof" and questioned individual venire members about the level of proof they would need in certain circumstances. During his voir dire, defense counsel mentioned the "slight tilt" that satisfies the burden in a civil case. At that point, the following exchange occurred between defense counsel and venirepersons 4 and 5:

COUNSEL: Juror Number 4, if there's that slight tilt in the scales of justice, 51 percent, I think they proved he's probably guilty. What's your burden?

NUMBER 4: Has to be beyond a reasonable doubt.

COUNSEL: That's right. So you'd have to vote not guilty; isn't that right?

NUMBER 4: It depends.

COUNSEL: Well, if you believe that they proved he was probably guilty, would you still convict him?

NUMBER 4: Yes, sir.

COUNSEL: Okay. Thank you. Everybody hear that? Does anyone else here feel like . . . Number 4? . . . . [Number 5] [d]o you agree with that?

NUMBER 5: Yes.

Based on this exchange, venirepersons 4 and 5 were included in the individual voir dire that was conducted later by the trial court. Number 4 was questioned on the court's own motion and number 5 at the request of defense counsel.

8

During the individual voir dire, the trial court sought assurance from Number 4 that he could require the State to prove each element of the offense charged in the indictment beyond a reasonable doubt. In response to the court's questions, Number 4 stated that he understood beyond a reasonable doubt is a higher burden of proof and that "probably guilty" is insufficient. Number 4 confirmed that he would be able to follow the court's instructions and find the defendant guilty only if he was convinced beyond a reasonable doubt, which he understood to be a higher standard than "probably."

Defense counsel then questioned venireperson number 5. When counsel asked Number 5 whether he would convict the defendant if he "thought he was 51 percent guilty," he answered, "Yeah, probably." The court then asked Number 5 the same question, and he responded, "Yes, I believe that is correct." The court questioned Number 5 further to determine whether he could follow the instructions on burden of proof. When the court again explained that beyond a reasonable doubt does not have a definition, Number 5 asked whether that could be "as low as 51 percent." The court responded that there was no quantitative standard, but also informed Number 5 that "probably is not the standard." After further questioning and explanation by the trial court, Number 5 stated that he believed he could follow the instruction and hold the State to its burden of proof. The trial court then denied Appellant's challenges for cause.

**The Trial Court's Ruling**

Because venirepersons 4 and 5 were subject to a challenge for cause based on their answers during voir dire, the trial court had the discretion to examine each of them further. *See Cardenas*, 325 S.W.3d at 84-85. During the court's questioning, it became evident that both understood the State's burden of proof was beyond a reasonable doubt. They were less clear about the degree of certainty required to meet that level of proof, particularly when the required certainty was expressed as a percentage. After the trial court's explanations and questioning, both venirepersons agreed that 51% was not sufficient and confirmed that they could follow the court's instructions.

Based upon our review of the entire record and giving due deference to the trial court, we hold there is sufficient evidence to support the court's rulings. *See Gonzales*, 353 S.W.3d at 831. Therefore, the record does not show a clear abuse of discretion. *See Hernandez*, 390 S.W.3d at 317. We overrule Appellant's second issue.

9

In his third issue, Appellant contends that the trial court erred by allowing impermissible hearsay testimony from the victim's widow, Rochelle Kemp.

## Standard of Review

We review the trial court's rulings on hearsay objections for an abuse of discretion. *Saavedra v. State*, 297 S.W.3d 342, 349 (Tex. Crim. App. 2009). A trial court abuses its discretion when a decision is so clearly wrong as to lie outside the zone within which reasonable persons might disagree. *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). The trial court's ruling on the admissibility of evidence will be upheld if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008).

## Applicable Law

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Hearsay is generally inadmissible unless it falls within a recognized exception to the hearsay rule. *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005); *see also* TEX. R. EVID. 802. One such exception is the present sense impression. TEX. R. EVID. 803(1).

A "present sense impression" is a statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter. *Id*. The rule is predicated on the notion that the utterance is a reflex product of immediate sensual impressions, unaided by retrospective mental processes. *Fischer v. State*, 252 S.W.3d 375, 380 (Tex. Crim. App. 2008). Thus, the rationale for the exception stems from the statement's contemporaneity, not its spontaneity. *Rabbani v. State*, 847 S.W.2d 555, 560 (Tex. Crim. App. 1992) (en banc).

If the declarant has had time to reflect upon the event and the conditions he observed, the statement and the event it describes are no longer contemporaneous. *Fischer*, 252 S.W.3d at 381. Consequently, the present sense impression exception does not apply. *Id*. There is no requirement that the statement be made to another (the witness who reports it) who would have an equal opportunity to observe the event and check a misstatement. *Rabbani*, 847 S.W.2d at 560 n.9 (observing that Rule 803(1) contains no requirement that witness have opportunity to check

veracity of declarant's statement; disavowing contrary holding in *Myre v. State*, 545 S.W.2d 820 (Tex. Crim. App. 1977)).

A person who is observing or experiencing something may explain or describe it to someone else over the telephone. *Russo v. State*, 228 S.W.3d 779, 809 (Tex. App.–Austin 2007, pet. ref'd). What the listener hears is a present sense impression. *Id*.

**Analysis**

Rochelle Kemp testified that she had two telephone conversations with her husband shortly before he died. She described the second conversation as follows:

> I heard him say, "Sharieff, up there," and Sharieff was saying something, but I didn't – couldn't understand what he was saying.
>
> And then Ronnie said it again, "No, Sharieff, up there." And all of a sudden, I heard something pop and like something was moving, and he called Sharieff's name. And then he said, "I've been shot."

At trial, Appellant objected to this testimony based on hearsay and confrontation. The trial court overruled the objections and admitted the testimony as a present sense impression. On appeal, Appellant urges here that these statements did not constitute a present sense impression.

Appellant points out that "case law has evolved to further explain that even testimony that may meet the definition of a present sense impression is nonetheless inadmissible as hearsay where the statements made 'might be intended by the declarant to be made with an eye toward future litigation or evidentiary use.'" *See Fischer*, 252 S.W.3d at 384. And he asserts that Kemp's statements to his wife in their second telephone conversation were of this character.

*Fischer* provides a detailed examination of the present sense impression exception to the hearsay rule. *Id*. at 378-87. In its discussion, the court describes statements falling within this exception as "'street corner' utterances made by ordinary people before any thoughts of litigation have crystallized." *Id*. at 379. The court also noted that once litigation becomes the focus, the declarant's observations, narrations, and conclusions become reflective, calculated, and inadmissible. *Id*. at 385.

In *Fischer*, the court noted that on the scene observations and narratives of a police officer investigating a suspected offense are "fraught with the thought of a future prosecution." *Id*. at 384. For that reason, the court concluded that a trooper's statements on a videotaped narrative he

11

prepared while conducting a roadside investigation of a suspected DWI offense constituted "a calculated narrative in an adversarial, investigative setting." *Id*. at 386. Therefore, the statements were inadmissible as present sense impressions under Rule 803(1).

Appellant insists that Ronnie Kemp also had "an eye toward future litigation or evidentiary use." Specifically, he notes that a police officer testified that Kemp's sister "told Dispatch she'd received a call from Ronnie advising he was going to the park, and if anything happened to him that's where he'd be." In our view, this statement by the victim reflects only that he wanted his family to be able to find him if something happened to him. But even if this statement could be construed as showing Kemp contemplated future evidentiary use of the statement, there is nothing to indicate any such contemplation during his second telephone conversation with his wife. His statements are nonreflective and describe the event he was perceiving. Therefore, the statements are present sense impressions, and the trial court did not abuse its discretion in admitting them. We overrule Appellant's third issue.

### SCIENTIFIC EVIDENCE

In his fourth issue, Appellant contends that the trial court erred in admitting the testimony of two police officers regarding the BLUESTAR presumptive test for blood performed on Appellant's shoes and vehicle.

#### Expert Testimony

Texas Rule of Evidence 702 requires scientific evidence to be reliable and relevant. *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992). For an expert's testimony to be relevant, the testimony must assist the trier of fact in understanding the evidence or determining a fact in issue. *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996); *see also* TEX. R. EVID. 702. Expert testimony that does not relate to a fact in issue is not helpful. *Jordan*, 928 S.W.2d at 555. If the proponent demonstrates that the scientific evidence is both relevant and reliable, the trial court should admit it unless it determines that the probative value of the evidence is outweighed by some factor identified in Texas Rule of Evidence 403. *Kelly*, 824 S.W.2d at 573.

#### The Evidence

Tyler Police Department investigators performed a presumptive test for blood on a pair of leather shoes belonging to Appellant and on Appellant's truck. The State sought to introduce the

12

results of this testing, and Appellant requested a hearing to determine whether the State could make the "scientific predicate" necessary for admission of the evidence.

At the hearing, Investigator Donald Malmstrom explained that he conducted the presumptive test for blood on the shoes using BLUESTAR reagent and that he mixed and applied the product according to the directions he was provided. He explained further that BLUESTAR creates a blue "photoluminescence" when it is applied to an area that contains blood. He confirmed that he was not saying there was definitely blood on the shoes–only that there was a "presumptive positive test," meaning that the BLUESTAR reacted in certain areas of the shoes. He then sent the shoes, along with the time lapse photographs taken during the testing process, to Orchid Cellmark for confirmation testing. On cross examination, Inspector Malmstrom testified that he had no chemistry background and could not explain the underlying scientific theory about how the substance in the BLUESTAR tablets reacts with blood.

At the conclusion of the hearing, Appellant objected that the State did not establish the proper predicate for admission of the evidence. Alternatively, he cited Texas Rules of Evidence 401, 402, and 403, objecting that admission of the testimony would be more prejudicial than probative and confuse the issues. The trial court overruled Appellant's objections and allowed the testimony. Inspector Malmstrom related to the jury that the BLUESTAR reagent reacted in several areas on the shoes. His supervisor, Sergeant Jeffrey Rackliff, testified that there was no reaction when BLUESTAR was applied to Appellant's truck. He also described BLUESTAR as a presumptive test.

Both officers explained that a presumptive test shows an officer that something may be blood and that further testing is necessary.

## Analysis

Appellant argues that the State failed to establish that BLUESTAR testing is scientifically reliable or that the officers who performed the testing were qualified to testify about it. As a result, he urges, the trial court erred in permitting the officers' testimony. Appellant also maintains that the error was harmful because the evidence "carr[ied] the imprimatur of science" in a case that was largely circumstantial and the State was then able to refer to the shoes in closing argument. In other words, he argues that the admission of the evidence left a false impression with the jury about the scientific validity of the BLUESTAR test. The State counters that even if

the evidence was erroneously admitted, Appellant was not harmed because the Orchid Cellmark test results confirmed there was blood on the shoes. We agree.

Huma Nasir, a forensic DNA analyst with Orchid Cellmark, performed the confirmation testing on Appellant's shoes. Nasir testified, as did Inspector Malmstrom and Sergeant Rackliff, that BLUESTAR is merely a presumptive test for blood. She described the methodology she used in her testing and confirmed that she tested the shoes for blood in the areas in which the time lapse photographs showed the BLUESTAR reagent had reacted. She also testified that some of those areas tested positive for blood and some did not. But according to her testimony, she found blood on both shoes. No objections were made to this testimony.

The Orchid Cellmark test results confirmed the presumptive test results–that there was blood on both of Appellant's shoes. Therefore, assuming that the admission of the BLUESTAR results was error, and assuming further that the error created the false impression Appellant suspects, the error was harmless. *Cf.* ***Leday v. State***, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (error harmless when other such evidence is received later without objection). Appellant's fourth issue is overruled.


### ADMISSIBILITY OF TEXT MESSAGES

In his fifth issue, Appellant complains that the trial court erred in admitting, over his hearsay and confrontation objections, text messages allegedly between Amie Dean and Jaquan Dawson.

**The Text Messages**

The State obtained the July 5, 2010 cell phone records of various individuals, including Amie Dean and Jaquan Dawson. At trial, the State called the custodian of records for Metro PCS, who testified about what those records showed. Through that witness, the State sought to introduce the following text messages purportedly sent between Amie Dean and Jaquan Dawson:

> [Amie] Aye I kno the   n***a whos the hitman fa goldie and he on sum mo n***as heads n tyler my dad kno em that's how I seen the n***a but look its all bad and sum
>
> [Jaquan] O well ok so do u go to work today

14

[Amie] that had said to b snitchn keep it to urself but im lettn u kno without lettn u kno kelly [Jaquan's father] name came up[3]

[Amie] Lata but its sum crazy shyt but he stright killa he jus got out 4m doin 20 yrs fa killen a n***a he was sayin he was gne make an example of a few n****s

[Jaquan] Bae id give a f*k about him datz not wat I wanna talk about do u wanna b wit da n***a or sum

[Amie] I was tellin u cuz the man brought up ya dad name and naw

Appellant objected on various grounds including hearsay and confrontation. After extended arguments, the trial court overruled Appellant's objections and admitted the text messages.

**Hearsay**

The State contends that the text messages were admissible as statements by a co-conspirator in furtherance of the conspiracy and as statements against penal interest. However, we need not decide whether the text messages are inadmissible hearsay because even if they are, any error in admitting them is harmless.

The improper admission of hearsay is nonconstitutional error. *See Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). Therefore, the error will be considered harmless, if after examining the record as a whole, we are reasonably assured the error did not affect the appellant's substantial rights. TEX. R. APP. P. 442.(b); *Coble*, 330 S.W.3d at 280. An error is considered to affect an appellant's substantial rights when the error had a substantial and injurious effect or influence on the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 2010). Overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling. *Leday*, 983 S.W.2d at 718.

In her text messages, Amie Dean referred to a "hitman" for Kemp and stated that she had met him because her dad knows him. But Tajshay Penny also testified about the "hit." Penny testified that on the day of the murder, she traveled with Appellant and Amie to a Tyler location. As they drove, Appellant said he was going to talk to a "guy that had been having previous problems with Ronnie about him being a confidential informant." Appellant also said he was going to talk to the man about "putting a hit out on Ronnie." This testimony was admitted without

---

[3] The victim was also known as "Goldie."

15

objection. Consequently, even if the trial court's admission of the text messages was error, we cannot conclude that Appellant was harmed. *See id*.

**Right to Confrontation**

To protect a defendant's Sixth Amendment right to confront witnesses, the Supreme Court in *Crawford v. Washington* restricted the admissibility of testimonial hearsay statements. 541 U.S. 36, 68, 124 S. Ct. 1354, 1374, 158 L. Ed. 2d 177 (2004). Under *Crawford*, testimonial hearsay statements of a person who does not appear at a defendant's trial are inadmissible unless that person was unavailable to testify and the defendant had a prior opportunity for cross examination. Whether a particular statement is testimonial is a question of law. *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008). Accordingly, we review *Crawford* issues de novo. *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006). However, we defer to the trial court's resolution of credibility issues and historical fact. *Id*.

In determining whether a statement is "testimonial," we use the standard of the objectively reasonable declarant standing in the shoes of the actual declarant. *Id*. at 742-43. The determination does not depend on the declarant's expectations. *See Michigan v. Bryant*, 131 S. Ct. 1143, 1156, 179 L. Ed. 2d 93 (2011) (confirming that objective inquiry is required). A statement is more likely to be testimonial if the person who heard, recorded, and produced the statement at trial is a government officer. *Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364. *Paul v. State*, No. 12-10-00280-CR, 2012 WL 3101743, at *5 (Tex. App.–Tyler July 31, 2012, pet. ref'd) (op.) (not yet released for publication). Casual remarks to acquaintances are generally nontestimonial. *Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364.

Here, the quoted portion of Amie's text messages to Jaquan related to the anticipated "hit" on Ronnie Kemp. In these messages, Amie stated that she had met the "hitman" because her dad knows him. She also provided information about the man's most recent criminal history and his plan to make an example of some people he believed were "snitchin," possibly including Jaquan's father. But the text messages were casual statements to a friend. This is not a situation that "would lead an objective witness reasonably to believe that the statement[s] would be available" for later judicial proceedings.[4] *See Crawford*, 541 U.S. at 52, 124 S. Ct. at 1364; *Woods v. State*,

---

[4] One author has observed that electronic Communications–texts, status updates, tweets, and the like–will rarely be made with a primary purpose of creating an out of court substitute for trial testimony. Jeffrey Bellin,

16

152 S.W.3d 105, 113-14 (Tex. Crim. App. 2004) (en banc).   Therefore, the statements in the text messages were nontestimonial, and the *Crawford* rule pertaining to testimonial hearsay is not applicable here.   Consequently, the trial court did not err in overruling Appellant's confrontation objection.

Because any error in admitting the text messages was harmless, and because *Crawford* is inapplicable, we overrule Appellant's fifth issue.


### THE INVESTIGATION EXCEPTION

In his sixth issue, Appellant contends that on a number of occasions, the State was allowed to present inadmissible hearsay under the "investigation" exception.   This, Appellant claims, resulted in the admission of inadmissible evidence and the denial of Appellant's right to confront the purported declarants.

Police have been allowed to testify to information that might otherwise be considered hearsay in order to explain the course of an investigation or their presence at a crime scene.   *West v. State*, No. 05-02-01653, 2003 WL 22976705, at *7 (Tex. App.–Dallas Dec. 19, 2003, pet. ref'd) (op., not designated for publication); *Thornton v. State*, 994 S.W.2d 845, 854 (Tex. App.–Fort Worth 1999, pet. ref'd).   Usually it will be relevant for a testifying officer to relate how he happened upon the scene of a crime or accident.   *Schaffer v. State*, 777 S.W.2d 111, 114 (Tex. Crim. App. 1989).   Therefore, it is permissible for the officer to testify that he was acting in response to "information received."   *Id*.   However, the officer should not be permitted to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports on grounds that he was entitled to tell the jury the information upon which he acted.   *Id*. at 114-15. The critical question is whether there is an inescapable conclusion that a piece of evidence is being offered to prove statements made outside the courtroom.   *Id*. at 114.

Appellant identifies five witnesses whose testimony he claims includes impermissible hearsay admitted under the "investigation" exception.   Appellant concedes, however, that "many of the challenged statements" were admitted when the declarant actually testified and therefore, harm cannot be shown on that basis.   *See King v. State*, 953 S.W.2d 266, 273 (Tex. Crim. App.

---

*Applying Crawford's Confrontation Right in a Digital Age*, 45 TEX. TECH. L. REV. 33, 41 (Fall 2012) (citing *State v. Damper*, 225 P.2d 1148, 1151 (Ariz. Ct. App. 2010) and *Hope v. State*, 903 N. E. 2d 977, 989 (Ind. Ct. App. 2009)).

1997). Yet, he contends that to protect the integrity of the trial process and prevent the State's repetition of the error with impunity, we should find harm under one of the two rules guiding our harm analysis. *See* TEX. R. APP. P. 44.2(a) (court of appeals must reverse judgment of conviction or punishment unless court determines beyond a reasonable doubt that error did not contribute to conviction or punishment); TEX. R. APP. 44.2(b) (court must disregard nonconstitutional error not affecting substantial rights).

In substance, Appellant requests that we determine harm by applying the *Harris* factors. S*ee Harris v. State*, 790 S.W.2d 568, 587-88 (Tex. Crim. App. 1989). In *Harris*, the court of criminal appeals stated that when addressing harm from constitutional error, an appellate court should be concerned with the integrity of the process leading to the conviction and not the result. *Id*. at 587, 588. Therefore, the court should examine the source of the error, the nature of the error, whether or to what extent it was emphasized by the State, and its probable collateral implications. *Id*. The court should also consider how much weight a juror would probably place upon the error, and whether declaring the error harmless would encourage the State to repeat it with impunity. *Id*. In short, the reviewing court was required to focus not on the weight of the other evidence of guilt, but rather on whether the error at issue might possibly have prejudiced the jurors' decision making. *Id*.

The court has recently held that the *Harris* factors are not helpful in Rule 44.2(b) analyses, and particularly the factor of "whether declaring the error harmless would encourage the State to repeat it with impunity." *Mason v. State*, 322 S.W.3d 251, 257 n.10 (Tex. Crim. App. 2010). The court further described the *Harris* factors as "unnecessarily limiting when we are to consider the record as a whole." *Id*. Even more recently, the court disavowed all but four of the original *Harris* factors when determining whether a constitutional error was harmful–the nature of the error, whether it was emphasized by the State, the probable implications of the error, and the weight the jury would like have assigned to it in the course of its deliberations. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011). Whether a declaration of harmlessness would encourage the State to repeat the error with impunity did not survive. *See id*. at 821. Moreover, the court held that *Harris* erroneously included within its ambit any concern for the integrity of future trial. *Id*. Accordingly, we decline to consider how a determination of harmlessness in this case will affect the State's conduct in future cases.

18

Based upon our review of the record, we agree with Appellant that he cannot show harm under either Rule 44.2(a) or 44.2(b).   We overrule Appellant's sixth issue.

## DISPOSITION

Having overruled Appellant's six issues, we ***affirm*** the judgment of the trial court.

**SAM GRIFFITH**
Justice

Opinion delivered August 29, 2013.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(DO NOT PUBLISH)



# COURT OF APPEALS
# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS
# JUDGMENT

## AUGUST 29, 2013

## NO. 12-11-00267-CR

## SHARIEFF DEAN,
Appellant

V.

## THE STATE OF TEXAS,
Appellee

---

Appeal from the 241st Judicial District Court

of Smith County, Texas. (Tr.Ct.No. 241-1774-10)

---

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Sam Griffith, Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

20