**Affirm and Opinion Filed August 4, 2022**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-20-00951-CR**

**JOEL THOMAS DIES, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 219th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 219-83177-2019**

## OPINION

Before Justices Myers, Carlyle, and Goldstein
Opinion by Justice Myers

A jury convicted appellant Joel Thomas Dies of continuous sexual abuse of a child under the age of fourteen and assessed punishment at sixty years in prison. Appellant raises two issues, arguing he was denied his constitutional right to confront adverse witnesses and the trial court erred in admitting extraneous offense evidence. We affirm.

### DISCUSSION

### I. Right to Confrontation

In his first issue, appellant argues he was denied his constitutional right to confront two adverse witnesses that the trial court allowed to testify remotely.

Appellant was charged with continuous sexual abuse of a child under the age of fourteen.[1] The trial court held a pretrial hearing on Thursday, October 15, 2020, four days before the start of trial. The State notified the court and defense counsel that it was experiencing difficulties with two of its witnesses' appearing in person. The first witness, Eli Molina, who conducted complainant's forensic interview, was in quarantine because of his exposure to the COVID-19 virus, and he would not be out of quarantine until the following Wednesday.

The second witness was AD, the extraneous child abuse victim, who was now an adult. The State explained that she was thirty-eight weeks pregnant; she lived two hours away; and she had been advised not to travel. The trial court proposed calling Molina out of order or having him testify remotely by "Zoom," which is a type of teleconferencing software. The defense objected to both suggestions. The State requested that AD be permitted to testify via Zoom given her medical condition and the threat of exposure to COVID-19, and defense counsel again objected. The State argued that if it was not going to be able to reach an agreement with the defense,

---

[1] The indictment charged that on or about June 14, 2014, through December 18, 2018, during a period of thirty or more days in duration, appellant committed two or more acts of sexual abuse against complainant, including aggravated sexual assault of a child by intentionally and knowingly causing the sexual organ of complainant, a child then younger than fourteen years of age, to contact the defendant's male sexual organ; causing complainant's anus to contact the defendant's male sexual organ; causing the penetration of complainant's anus by means of the defendant's finger; causing complainant's mouth to contact the defendant's male sexual organ; and causing the penetration of complainant's anus by means of a sex toy. The indictment also alleged indecency with a child by contact by intentionally and knowingly, and with intent to arouse or gratify the sexual desire of any person, engaging in sexual contact by touching part of the genitals of complainant, a child younger than seventeen years of age, by means of the defendant's hand; and by causing complainant's hand to touch part of the defendant's genitals. The indictment further alleged that at the time of the commission of each of these acts of sexual abuse, the defendant was seventeen years of age or older and complainant was a child younger than fourteen years of age.

it would request a continuance based on a material witness not being available. The trial court denied the State's request. Jury selection took place the following day, Friday, October 16, 2020.

On Monday, October 19, before the start of trial, the State notified the court that, following the prior hearing, Molina had again tested positive for COVID-19. He would therefore not be ready to testify by Wednesday, as previously expected. The State asked the court to allow Molina to testify remotely by video conferencing, and it pointed to the Office of Court Administration's (OCA's) guidelines permitting remote testimony during the pandemic. Defense counsel objected to the witness's testifying remotely based on confrontation grounds, citing *Maryland v. Craig*, 497 U.S. 836 (1990), and he also objected to a continuance. The State replied that the witness's upper body would be visible on videoconferencing, and that the screen was large enough that defense counsel would be able to see, hear, and cross-examine the witness as though he were testifying in person.

The court ruled that Molina could testify remotely. In doing so, the court noted the need to "get the cases moving" and the defendant's right to a speedy trial, as well as the defense's rejection of a continuance. The court observed that the pandemic had made it "very difficult for the Court to balance the different interests between criminal cases, specifically, between the State and the Defense, trying to get the cases moving, having the Defense have a speedy trial."

The court then took up the question of the admissibility of AD's testimony

under article 38.37 of the Code of Criminal Procedure,[2] and whether she would be allowed to testify remotely. During that part of the hearing, AD testified remotely that the defendant was her uncle; she lived in Bowie County; she was pregnant with her second child, which was due in two weeks; and she had been advised by her doctor not to travel out of town. She also recounted how, years before, appellant had sexually abused her. AD testified that the abuse occurred when she and appellant were both living in the same house in Louisiana with AD's grandparents. Appellant was an adult; AD was about 5 years old. AD recalled two incidents, first testifying how she remembered lying on a futon in appellant's bedroom on her back with appellant on top of her and their pants down. Appellant kissed her and his breath tasted like powdered milk. He touched her vagina with his hand and his penis, and she felt very uncomfortable. The assault ended when AD's grandfather knocked on the locked bedroom door. AD also recalled that one morning, when her grandparents were sleeping, appellant had her squat outside of his doorway with her pants down, and appellant spanked her on her buttocks.

After the parties argued over whether AD's testimony was admissible under article 38.37, and the court ruled AD could testify, the State again urged the court to allow her to testify remotely. The State reiterated how dangerous it would be for AD to travel and appear in-person because of her late-stage pregnancy and the

---

[2] TEX. CODE CRIM. PROC. art. 38.37 ("Evidence of extraneous offenses or act.").

–4–

pandemic. The State also argued for the materiality of AD's testimony and its need for her testimony, given the absence of physical evidence or eyewitness testimony corroborating complainant's account of the abuse. As with Molina, the defense objected to AD's remote testimony on confrontation grounds and restated its objection to a continuance. The court ruled that AD could testify remotely and "appear by Zoom."

The following morning, Tuesday, October 20, defense counsel moved for a continuance. Counsel informed the trial court he decided to ask for a continuance after conferring with his client following the previous day's hearing and discussing with appellant how turning down the opportunity to continue the case would impact his confrontation clause claim on appeal. Defense counsel told the court that after discussing matters such as "waivers and constitutional rights" with appellant, "he informed me that he understands that there could be certain appellate issues if you're giving him a remedy to something for which I am objecting to." Counsel also stated:

> But ultimately, at the end of the day, it's [appellant's] decision. It's not [defense counsel's] decision, his attorney. I explained to him that the Court was giving him a remedy and allowing him to rectify something that I was objecting to, i.e., the Zoom—witnesses being able to testify via Zoom.

> He understood that. He understands he does have a United States Constitutional right and the Supreme Court has provided he does have a right of confrontation. And after me explaining that to him again, he informed me that he does hereby request a continuance of his case in order that we do not have to go forward and he does not have to give up his constitutional right of confrontation of these witnesses.

The trial court then questioned the court administrator for Collin County, Kim Alvarado, who was described by the court as "our go-to person for the technology it takes to call a witness via Zoom." She testified regarding the videoconferencing technology that would be used for remote testimony, explaining that the courtroom was equipped with a sound system that included microphones at each of the counsel tables and the bench. She also stated that audio from the videoconferencing system would be broadcast over the courtroom's audio system. In addition, a laptop would be set up at each counsel table so that the attorneys and the defendant could see the witness, and the witness and the attorneys could, in turn, see each other. The video would be displayed on two large TV screens in the courtroom (a 90-inch TV screen and a 75-inch screen), and Alvarado agreed that the witness would appear "larger than life in the courtroom." Alvarado also explained that the equipment had been tested to ensure it was functioning properly. The State pointed out that the witnesses would be positioned on camera so that they were visible to the jury from the waist up. The State also said it would be willing to provide Molina's notes to defense counsel in advance of his testimony. The trial court observed that the same Zoom videoconferencing technology had been used when AD testified remotely during the pretrial hearing. Although the audio was not connected to the courtroom's audio system, the court noted that it was able to see the witness from the waist up and it had no difficulties hearing her on the court's computer.

The trial court judicially noticed the following:

–6–

The Court takes judicial notice of the Supreme Court's emergency orders dealing with Covid. The Court will note too they have charged the OCA, the Office of Court Administration, to come up with guidelines on how to proceed.

The OCA, through that directive by the Supreme Court, is requiring the Court to provide a safety plan for each trial tried to Collin County approved by the OCA and the local regional judge. And Collin County has done all of those things. This has been approved by the OCA for a trial, and this specific one. We have to do it case by case and [appellant's] case has been approved for the trial.

I'm not saying they said specifically for a witness to appear by Zoom, but the emergency order does say to accommodate any witnesses via Zoom. And they didn't really make a specification only on these cases, only on CAC [Crimes Against Children] cases and, so, that's what we've done.

The court also stated:

[T]he Court has tried to and continues to try to, like all courts in Texas during this pandemic, to weigh the different interests of each of the parties. That is to a [sic] speedy trial, to move the case forward, to balance the safety and health of the jurors, and the Defendant's right to go to a speedy trial. And you've asked for a continuance, and that is noted.

And the court concluded as follows:

And so, the Court has balanced all of those interests. I think we would be in a different spot if the victim of the case wanted to appear by Zoom. I think that might be a little different. But I think I'm comfortable with balancing all of those interests in my earlier decision that this case is going to proceed. The witnesses will appear by Zoom.

I do believe the technology is excellent compared to the 1990 case that you cited. Things have changed a lot. And under the conditions I think it's appropriate for those witnesses to appear by Zoom and your motion for continuance is denied.

Both Molina and AD subsequently testified before the jury on Zoom. An audio issue briefly delayed the start of Molina's testimony. At the outset of AD's

–7–

testimony, she was asked to speak louder, but no other sound issues with either witness are apparent from the reporter's record. Both witnesses confirmed before the jury that they were alone at their respective locations. Both also confirmed that they could see the judge, defense counsel, and the State, but not the jury. Molina said he could not see appellant but could see the trial judge and counsel for both parties.[3] AD said she could see appellant, and she identified him based on an article of clothing he was wearing. She tried covering him up with her finger because she did not want to look at him, but she could see him.

The Sixth Amendment of the United States Constitution as applied to the states through the Fourteenth Amendment provides criminal defendants with the right to be confronted with the witnesses against them. U.S. CONST. amend. VI. This provision, known as the Confrontation Clause, guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact. *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988).

But the right to a physical face-to-face meeting is not absolute and "must occasionally give way to considerations of public policy and the necessities of the case." *Craig*, 497 U.S. at 848. In *Craig*, the Supreme Court rejected a defendant's Sixth Amendment challenge, upholding a Maryland rule that allowed child victims of abuse to testify by one-way closed-circuit television from outside the courtroom.

---

[3] This may have been because the defendant moved out of the videoframe he shared with defense counsel.

–8–

*Id*. at 858. The defendant could see the testifying child witness on a video monitor, but the child witness could not see the defendant. *Id*. at 841–42. The defendant argued the procedure violated his Sixth Amendment right to confrontation because he was denied a physical face-to-face encounter with the witness. *Id*. at 842. The Supreme Court rejected this argument, stating that although "we reaffirm the importance of face-to-face confrontation with witnesses appearing at trial, we cannot say that such confrontation is an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers." *Id*. at 849–50. The Court explained that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id*. at 850. The Supreme Court stated that "the Confrontation Clause reflects a *preference* for face-to-face confrontation," *id*. at 849 (citing *Ohio v. Roberts*, 448 U.S. 56, 63 (1980)), but criminal defendants do not have "the *absolute* right to a face-to-face meeting with witnesses against them at trial." *Id*. at 844. The Court also acknowledged that "use of the one-way closed circuit television procedure, where it is necessary to further an important state interest, does not impinge upon the Confrontation Clause's truth-seeking or symbolic purposes." *Id*. at 852. However, "[t]he requisite finding of necessity must of course be a case-specific one." *Id*. at 855.

Like *Craig*, Texas law stresses that there must be a case-specific finding of

necessity and that the trial court must hear evidence. *Haggard v. State*, 612 S.W.3d 318, 325 (Tex. Crim. App. 2020); *see also Craig*, 497 U.S. at 855. In *Haggard*, a sexual assault nurse examiner (SANE) was allowed to testify from Montana through FaceTime, over defense objections. 612 S.W.3d at 323–24. The State argued at trial that the witness's testimony was essential because only she could prove-up the chain of custody of the SANE kit and its contents. *Id*. at 323. The State, however, did not subpoena the witness, who notified prosecutors that she would not voluntarily appear and testify. *Id*. The court of criminal appeals stated that, since *Craig* was decided, the court "has required a necessity finding in every case in which we have considered a Confrontation Clause challenge to the cross-examination of a witness via two-way video system." *Haggard*, 612 S.W.3d at 325. Applying *Craig*, the court noted that "the judge heard no evidence and made no case-specific finding." *Id*. at 327. The court concluded it did "not think it is an important public policy to allow the State to procure a witness's testimony remotely when the State had sufficient time and ability to subpoena the witness, and the witness was available to appear and testify, but the State chose not to." *Id*. Furthermore, "the right to physical, face-to-face confrontation lies at the core of the Confrontation Clause, and it cannot be so readily dispensed with based on the mere inconvenience to a witness." *Id*. at 328.

At the time this case was tried, in October 2020, Texas courts were subject to several emergency-related orders that impacted court proceedings during the COVID-19 pandemic. First, the Governor declared in a March 2020 proclamation

–10–

that COVID-19 posed "an imminent threat of disaster." *See* The Governor of the State of Tex., Proclamation No. 41-3720, 45 Tex. Reg. 2087, 2095 (2020). That proclamation declared a state of disaster for all Texas counties. *Id.* Second, the Texas Supreme Court issued an order that all Texas courts take certain precautions in both civil and criminal trials to avoid risk to court staff, parties, attorneys, jurors, and the public. *See Twenty-Sixth Emergency Order Regarding the COVID-19 State of Disaster*, 609 S.W.3d 135 (Tex. 2020) (Emergency Order). The Texas Supreme Court's order authorized courts to "allow or require anyone involved in any hearing, deposition, or other proceeding of any kind—including but not limited to a party, attorney, witness, court reporter, grand juror, or petit juror—to participate remotely, such as by teleconferencing, videoconferencing, or other means." *Id.* at 135. This authority was "[s]ubject only to constitutional limitations." *Id.*; *see also In re State ex rel. Ogg*, 618 S.W.3d 361, 364 (Tex. Crim. App. 2021) (orig. proceeding) (recognizing that emergency order does not purport to authorize courts to modify substantive rights). Furthermore, the court's Emergency Order prohibited courts from conducting in-person proceedings, including in-person jury proceedings that were inconsistent with the latest guidance issued by the OCA. *See* Emergency Order, 609 S.W.3d at 137; *see also* OCA, *Guidance for All Court Proceedings During COVID 19 Pandemic* (OCA Guidance), https://www.txcourts.gov/media/1450221/guidance-for-all-court-proceedings-during-covid-19-pandemic.pdf. Regarding witnesses, the OCA Guidance provided:

–11–

Courts must inquire whether witnesses to the proceedings have COVID-related issues. To the degree constitutionally permissible or with consent of the parties, judges should permit witnesses to testify remotely via videoconference, especially if that witness has symptoms of or a recent positive test for COVID-19, has been recently exposed, or is vulnerable to contracting COVID-19.

OCA Guidance, at 8.

Appellant argues the trial court's decision to allow Molina and AD to testify remotely violated his right to confrontation because (1) the court failed to conduct the requisite evidentiary hearing regarding Molina's testimony; (2) neither witness was a child who needed protection from the trauma of testifying; and (3) a continuance would have resolved the issue and avoided the need for remote testimony.

Beginning with the question of whether the trial court held the requisite evidentiary hearing, the record shows that the court held two hearings where evidence on the issue of remote testimony was heard: (1) the hearing on October 19, 2020, where AD testified remotely; and (2) the October 20 hearing on the defense's request for a continuance, where the court examined the Collin County court administrator regarding the two-way videoconferencing technology used for the remote testimony. Also, during the pretrial hearing held on October 15, 2020, the prosecutor informed the court that Molina had been exposed to the COVID-19 virus, and on October 19 the prosecutor told the court Molina had again tested positive. While Molina did not testify in those hearings, the law required that the court hear evidence on the matter, not that the evidence take a particular form. *See*

–12–

*Haggard*, 612 S.W.3d at 325, 327. Absent an objection, the trial court was free to consider the prosecutor's representations regarding Molina's health status. *See Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997) (unsworn statements of counsel may be considered as evidence absent an objection by opposing counsel).

As for appellant's argument that neither witness was a child, appellant asserts that *Craig* was based on the premise of protecting child witnesses from the trauma of testifying in child abuse cases where the court found the use of special procedures appropriate. But while the Supreme Court took note of "the State's traditional and transcendent interest in protecting the welfare of children," it also held that the requisite finding of necessity must be case-specific. *See Craig*, 497 U.S. at 854, 855. (internal quotation marks omitted). Moreover, Texas courts applying *Craig* have permitted remote testimony not only for a child witness, but also for witnesses who were on active military duty in another country, seriously ill, or who had a high-risk pregnancy. *See Gonzales v. State*, 818 S.W.2d 756, 758–59 (Tex. Crim. App. 1991) (ten-year-old witness undergoing psychological counseling); *Paul v. State*, 419 S.W.3d 446, 459 (Tex. App.—Tyler 2012, pet. ref'd) (witness with stage IV ovarian cancer who was undergoing chemotherapy); *Rivera v. State*, 381 S.W.3d 710, 712–13 (Tex. App.—Beaumont 2012, pet. ref'd) (crime-scene investigator who was on active military duty, serving in Iraq); *Stevens v. State*, 234 S.W.3d 748, 782 (Tex. App.—Fort Worth 2007, no pet.) (75-year-old witness who lived in Colorado and suffered from congestive heart failure, gastrointestinal bleeding, atrial fibrillation,

–13–

and vascular disease); *Lara v. State*, No. 05-17-00467-CR, 2018 WL 3434547, at *4 (Tex. App.—Dallas July 17, 2018, pet. ref'd) (mem. op., not designated for publication) (witness hospitalized after suffering heart attack); *Acevedo v. State*, No. 05-08-00839-CR, 2009 WL 3353625, at *8 (Tex. App.—Dallas Oct. 20, 2009, pet. ref'd) (not designated for publication) (witness with high-risk pregnancy).

Determining what is "necessary" under *Craig* requires, as we noted before, a case-specific analysis. In *Craig*, the Supreme Court stated that the confrontation requirement may be satisfied absent a physical, face-to-face confrontation only where (1) the "denial of such confrontation is necessary to further an important public policy," and (2) "the reliability of the testimony is otherwise assured." 497 U.S. at 850. We have found no Texas cases applying these factors in a situation like this. Some courts from other states, however, have recognized that protecting public health during the COVID-19 pandemic is an important public policy. *E.g.*, *Vazquez Diaz v. Commonwealth*, 167 N.E.3d 822, 838 (Mass. 2021). Still others have concluded that witness-specific showings of a particular risk associated with COVID-19, such as having an underlying health condition or testing positive for COVID-19 during the time the testimony is set to occur, justified allowing the witness to testify by two-way video. *E.g.*, *State v. Comacho*, 960 N.W.2d 739, 754–56 (Neb. 2021) (witness had tested positive for COVID-19 and was displaying symptoms); *People v. Warner*, No. ST-17-CR-031, 2020 WL 8019120, at *2 (V.I. Super. Ct. Nov. 2, 2020) (mem. op.) (seventy-five-year-old witness who suffered

from post-traumatic stress disorder and lived abroad was an at-risk individual for a possible infection); *see also United States v. Akhavan*, 523 F. Supp. 3d 443, 453–56 (S.D.N.Y. 2021) (witness was an unvaccinated 57-year-old who had hypertension and atrial fibrillation; his unvaccinated wife had hypertension; he cared for his 83-year-old mother-in-law; witness would have had to travel by plane for trial; and would have had to quarantine upon arrival and after returning home); *United States v. Donziger*, Nos. 19-CR-561 & 11-CV-691, 2020 WL 5152162, at *2–3 (S.D.N.Y. Aug. 31, 2020) (witness was a 72-year-old with health issues who would have had to travel by plane against doctor's advice and then quarantine upon arrival).

In this case, both *Craig* requirements are satisfied. To begin with, other Texas courts have taken judicial notice of the deadly nature of COVID-19. *See*, *e.g.*, *Kim v. Ramos*, 632 S.W.3d 258, 261 n.5 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (citing cases from Texas and federal courts that have judicially noticed COVID-19's existence, effects, and transmission). Furthermore, at the time of appellant's trial, in October 2020, no vaccine for COVID-19 was available, and one would not become available in Texas until December 2020. *See* News Release, Texas Health and Human Services, *COVID-19 Vaccine Arrives in Texas* (Dec. 14, 2020), https://www.dshs.texas.gov/news/releases/2020/20201214.aspx. And at that point it was available only to front-line healthcare workers and residents of long-term care facilities. *See id.* This availability was subsequently expanded to people aged 65 and older and those with certain medical conditions. *See* News Release, Texas

–15–

Health and Human Services, *People 65 and Older or With Certain Medical Conditions in Next Phase for COVID-19 Vaccine* (Dec. 21, 2020), https://www.dshs.texas.gov/news/releases/2020/20201221.aspx.[4]

To the extent that two-way video testimony ensured the health and safety of all trial participants during a global pandemic, it furthered an important public policy of protecting the public. *E.g., Warner*, 2020 WL 8019120, at \*2 ("The Court finds that preventing the spread of COVID-19 and not subjecting [the witness], who is an at-risk individual, to a possible infection is an important public policy that can only be served by allowing remote testimony in this situation."). Indeed, allowing Molina, who was infected with the virus, to testify by two-way video protected everyone associated with the trial, and allowing AD, who was in a late-stage pregnancy, to testify by two-way video protected her and her unborn child from possible exposure to the virus.

Regarding the second question, whether the reliability of the testimony was otherwise assured, a key inquiry in situations where the State wants a witness to testify remotely is whether the method of testimony used by the State preserved the salutary effects of face-to-face confrontation relevant to a Sixth Amendment analysis. *See Stevens*, 234 S.W.3d at 782 (citing *Craig*, 497 U.S. at 845–46); *Lara*,

---

[4] In fact, the vaccine would not become available to all adults in Texas until March of 2021. *See* News Release, Texas Health and Human Services, *Texas to Open COVID-19 Vaccination to All Adults on March 29* (March 23, 2021), https://www.dshs.texas.gov/news/releases/2021/20210323.aspx.

2018 WL 3434547, at *4. The salutary effects of face-to-face confrontation include (1) the giving of testimony under oath, (2) the opportunity for cross-examination, (3) the ability of the factfinder to observe the demeanor of the witness, and (4) the reduced risk that a witness will wrongfully implicate an innocent defendant when testifying in his presence. *Stevens*, 234 S.W.3d at 782 (citing *Craig*, 497 U.S. at 845–46); *Lara*, 2018 WL 3434547, at *4.

Those salutary effects were preserved in this case. Although the witnesses were not physically present in the courtroom when they testified by two-way video, they were administered the oath by the court and subjected to cross-examination by defense counsel. Appellant could see and hear the witnesses. AD, in turn, could see appellant and identified him in court. Molina could not see appellant but could see the trial judge and counsel for both parties. In addition, the witnesses were visible to the jurors from the waist up, just as they would have been had they testified in the courtroom. The court administrator told the court that the video feed would be displayed on two large TV screens in the courtroom, making the witnesses appear "larger than life." Thus, the jurors could assess the witnesses' demeanor during their testimony.

Appellant next argues that the trial court could have continued the trial, thus removing the need for remote testimony. However, this argument overlooks the fact that, at the time the case was tried, the only way to prevent the spread of COVID-19 was through preventative measures such as masking, social distancing, and certain

–17–

hygiene practices. There was no vaccine for COVID-19, and one would not become available, albeit on a limited basis, for two months. And the trial court obviously could not have anticipated this. Also, the case had been pending for a year before it was finally brought to trial, and, until his last-minute change in strategy, appellant steadfastly and repeatedly opposed a continuance. In addition, trial courts were prohibited from conducting in-person proceedings, including jury proceedings, unless they complied with the OCA's guidance. *See* Emergency Order, 609 S.W.3d at 137. That guidance specified that judges should, to the degree constitutionally permissible, permit witnesses to testify remotely if they had COVID-19 symptoms, had been recently exposed to COVID, or were vulnerable to contracting it. *See* OCA Guidance. Furthermore, a continuance would not have assured the complained-of witnesses' in-person availability, given that Molina was infected with COVID-19 and, therefore, at-risk of falling seriously ill or even dying from the disease. Similarly, even after giving birth, AD would have had to exercise caution when going out or traveling to minimize the risk to both herself and her newborn child.

On this record, we conclude the salutary effects of face-to-face confrontation were preserved and that the trial court err in permitting the two witnesses to testify via two-way video, or in determining that the technology used in this case did not deprive appellant of his Sixth Amendment rights. We overrule appellant's first issue.

## 2. Extraneous Offense Evidence

–18–

In his second issue, appellant contends the trial court erred in allowing extraneous offense evidence from AD because it was too "remote" in time to have probative value.

At the trial of a defendant accused of, among other things, continuous sexual abuse of a child, evidence the defendant committed a separate sex offense against another child may be admissible under section 2 of article 38.37 "for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." TEX. CODE CRIM. PROC. art. 38.37, § 2(a)(B), 2(b); *see also Kirk v. State*, No. 05-19-00768-CR, 2020 WL 5757338, at *5 (Tex. App.—Dallas Sept. 28, 2020, pet. ref'd) (mem. op., not designated for publication); *Strickland v. State*, No. 05-18-00170-CR, 2019 WL 2402983, at *3 (Tex. App.—Dallas June 7, 2019, no pet.) (mem. op., not designated for publication). Before evidence under article 38.37 is introduced, the trial judge must conduct a hearing outside of the jury's presence to "determine that the evidence likely to be admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt." TEX. CODE CRIM. PROC. art. 38.37, § 2-a(1); *see also Kirk*, 2020 WL 5757338, at *5. In this case, as discussed above, an article 38.37 hearing was held, and the trial court ruled that the extraneous offense evidence was admissible.

Under article 38.37, evidence of extraneous offenses against other children is admissible even if such evidence would be otherwise inadmissible under rules 404

or 405 of the Texas Rules of Evidence. *Id*. § 2(b); *Austin v. State*, No. 10-21-00181-CR, 2022 WL 1576201, at \*2 (Tex. App.—Waco May 18, 2022, no pet.) (mem. op., not designated for publication); *Strickland*, 2019 WL 2402983, at \*3. But the admission of evidence under article 38.37 is limited by rule 403's balancing test. *See* Tex. R. Evid. 403; *Belcher v. State*, 474 S.W.3d 840, 847 (Tex. App.—Tyler 2015, no pet.); *Fahrni v. State*, 473 S.W.3d 486, 492 (Tex. App.—Texarkana 2015, pet. ref'd).

Rule 403 allows the exclusion of relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. Probative value is the measure of how strongly the evidence serves to make more or less probable the existence of a fact of consequence to the litigation, coupled with the proponent's need for the evidence. *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). Unfair prejudice refers to a tendency to tempt the jury into finding guilt on an improper basis, such as an emotional one. *Id*. Confusion of the issues refers to "a tendency to confuse or distract the jury from the main issue in the case." *Id*.

When undertaking a rule 403 analysis, a trial court balances:

(1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a

–20–

jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gonzalez v. State*, 544 S.W.3d 363, 372 (Tex. Crim. App. 2018) (quoting *Gigliobianco*, 210 S.W.3d at 641–42); *see also Baker v. State*, No. 05-19-01051-CR, 2021 WL 1826829, at *2 (Tex. App.—Dallas May 7, 2021, pet. ref'd) (mem op., not designated for publication). In practice, however, "these factors may well blend together." *Gigliobianco*, 210 S.W.3d at 642. "We review the trial court's admission of extraneous offense evidence under an abuse of discretion standard." *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005).

Appellant contends that AD's testimony regarding the extraneous offense was too remote to be considered probative. Remoteness of an extraneous offense can significantly lessen its probative value. *E.g.*, *West v. State*, 554 S.W.3d 234, 239 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *Gaytan v. State*, 331 S.W.3d 218, 226 (Tex. App.—Austin 2011, pet. ref'd); *Newton v. State*, 301 S.W.3d 315, 320 (Tex. App.—Waco 2009, pet. ref'd). "Still, remoteness alone does not require the trial court to exclude evidence of an extraneous offense under Rule 403." *West*, 554 S.W.3d at 239 (citing *Gaytan*, 331 S.W.3d at 226). "Rather, remoteness is but one aspect of an offense's probativeness the trial court is to consider along with the other factors in the Rule 403 analysis." *Id.* at 239–40.

Regarding the first factor in the balancing test, evidence of a separate sexual offense against a child admitted under article 38.37, section 2(b) is probative of a

defendant's character or propensity to commit sexual assaults on children. *See Bradshaw v. State*, 466 S.W.3d 875, 883 (Tex. App.—Texarkana 2015, pet. ref'd). In this case, although appellant's abuse of AD began approximately 19 years before trial, it started around 12 years before his abuse of complainant. According to their testimony, appellant began abusing each of the victims when they were about 5 or 6 years old.[5] The abuse occurred in a home the girls shared with appellant, and appellant rewarded both girls afterwards with toys and/or games. Additionally, AD was appellant's niece. Appellant was not complainant's biological father but he was married to complainant's mother; his name appeared on complainant's birth certificate; he raised her from infancy; and she called appellant her dad.

Furthermore, the similarities between the abuse AD and complainant suffered strengthened the probative value of AD's testimony. *Gaytan*, 331 S.W.3d at 227. AD testified that, years before appellant abused complainant, he touched her vagina with his hand and his penis and, later, spanked her on her behind while she was in an open doorway with her pants down. Complainant described to Molina, the forensic interviewer, how appellant progressed from touching her genitals with his hands and putting his penis in her mouth to penetrating her anus with his finger, sex toys, and his penis. Complainant testified about the different homes in which the abuse occurred; the pain she experienced from the anal penetration; the difficulty

---

[5] AD was born in November 1996; complainant was born in April 2008.

she had breathing during some of the assaults; the sex toys appellant used on her; and the body positions she had to assume. She told the forensic interviewer the last incident occurred when she was nine years old and lived in Fort Worth. *See Fisk v. State*, 510 S.W.3d 165, 173–74 (Tex. App.—San Antonio 2016, no pet.) (trial court could have reasonably determined similarities between extraneous and charged child abuse strengthened probative value of extraneous abuse despite time gap of several years between them); *Gaytan*, 331 S.W.3d at 227 (trial court could have reasonably found probative force of "extremely remote" extraneous child abuse was "significantly bolstered" by its remarkable similarities to charged abuse). Moreover, the remoteness of the extraneous offense did not render "the probative value of this evidence so weak as to render this evidence inadmissible under Rule 403." *Harty v. State*, 552 S.W.3d 928, 935 (Tex. App.—Texarkana 2018, no pet.). On the contrary, the evidence relating to the extraneous offense was probative of appellant's character or propensity to commit indecent acts with children around complainant's age. Therefore, the first factor weighs strongly in favor of admission.

Turning to the second factor, the State's need for AD's testimony was great. There was no eyewitness testimony or physical evidence of abuse, such as DNA or documented injuries to complainant. The State's case against appellant rested on complainant's testimony about the abuse and/or statements she made to others about it. It was, in essence, appellant's word against complainant's. *See Robisheaux v. State*, 483 S.W.3d 205, 220 (Tex. App.—Austin 2016, pet. ref'd); *Gaytan*, 331

–23–

S.W.3d at 227.  In "he said, she said" sexual molestation cases such as this, "[r]ule 403 should be used sparingly to exclude relevant, otherwise admissible evidence that might bear on the credibility of either the defendant or the complainant."  *Hammer v. State*, 296 S.W.3d 555, 562, 568 (Tex. Crim. App. 2009).  This factor also weighs in favor of admission.

As for the third factor, we recognize that evidence of previous child sexual abuse is inherently inflammatory by nature and, hence, can be prejudicial.  *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013); *Newton*, 301 S.W.3d at 320.  Yet this potential was diminished in this case by the fact that AD's allegations were no more serious than complainant's.  Indeed, although appellant initially abused both girls in similar fashion, his abuse of complainant grew worse over time, and she recounted more instances of abuse than AD, and in greater detail.  *See Robisheaux*, 483 S.W.3d at 220.  Therefore, this factor weighs against admission, but only slightly.

Regarding the fourth factor, the ultimate issue in this case was whether appellant committed the offense against complainant as alleged in the indictment.  The trial court mitigated the tendency of the extraneous offense evidence to confuse or distract the jury from the main issues at trial by instructing them to use it for the limited purpose of "determining the motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident of the defendant, if any, in connection with the offense, if any, alleged against him . . . in this case, and for

–24–

no other purpose." The jury is presumed to have followed the court's instruction. *Resendez v. State*, 112 S.W.3d 541, 546 (Tex. Crim. App. 2003). Thus, this factor, too, weighs in favor of admission.

The fifth factor refers to evidence such as highly technical or scientific evidence that might mislead the jury because it is not equipped to weigh the probative force of the evidence. *Gigliobianco*, 210 S.W.3d at 641. In this case, however, the evidence in question was neither scientific nor technical in nature, and it pertained to matters, including victim credibility, that could easily be understood by a jury. We conclude the fifth factor weighs in favor of admission.

Concerning the sixth and final factor, AD's testimony comprised less than twenty pages out of the over 550-page guilt-or-innocence-phase reporter's record. *See*, *e.g.*, *Gaytan*, 331 S.W.3d at 228 (the disputed testimony was thirteen pages out of a 200-page trial transcript, and it was not repetitive of other evidence). Moreover, AD's testimony was not repetitive, and it was, in fact, critical to the State's case. Thus, this factor also weighs in favor of admission.

We conclude that the trial court, after balancing the rule 403 factors, could have reasonably concluded that the probative value of the evidence in question was not substantially outweighed by the danger of unfair prejudice and the other rule 403 factors. Accordingly, the trial court did not abuse its discretion in admitting the extraneous offense evidence, and we overrule appellant's second issue.

We affirm the trial court's judgment.

/Lana Myers//

LANA MYERS
JUSTICE

200951f.p05
Publish
TEX. R. APP. P. 47.2(b)



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

JOEL THOMAS DIES, Appellant

No. 05-20-00951-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 219th Judicial District Court, Collin County, Texas Trial Court Cause No. 219-83177-2019.

Opinion delivered by Justice Myers. Justices Carlyle and Goldstein participating.

Based on the Court's opinion of this date, the judgment of the trial court is

**AFFIRMED**.

Judgment entered this 4th day of August, 2022.